IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KING DRUG COMPANY OF FLORENCE, INC., et al., | : : | CIVIL ACTION |
| Plaintiffs, | : : | |
| v. | : : | No. 2:06-cv-1797 |
| CEPHALON, INC., et al., Defendants. | : : : | |

**Goldberg, J.**                                                                                                                                        **July 5, 2011**

**MEMORANDUM OPINION**

      The primary issue before the Court is whether one of the several named Defendants, Barr Laboratories, Inc., is entitled to withhold documents requested by Plaintiffs based upon the community-of-interest privilege. Also at issue is whether certain Barr communications, previously disclosed in discovery, constitute a waiver of the attorney-client privilege. These questions have been raised through Plaintiffs' motion to compel documents that were requested in discovery.[1] For reasons set forth below, I will grant Plaintiffs' motion in part, and order the production of the documents at issue. I, however, disagree with Plaintiffs' position that Barr has waived the attorney-client privilege regarding other communications.

**I.    Background**

      This case involves antitrust allegations raised by several proposed classes of Plaintiffs pursuant to the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2. Plaintiffs' claims are primarily based upon

---

      [1] Plaintiffs' motion is styled "Motion of King Drug Direct Purchaser Plaintiffs to Compel Barr Pharmaceuticals, Inc. to Produce Documents Withheld on Privilege Grounds" (doc. no. 350).

what is commonly referred to as a "reverse payment settlement." These types of settlements are typically entered into as the result of patent litigation between a brand name drug manufacturer and a generic drug manufacturer, such as Barr.

The multi-party litigation before the Court stems from four patent infringement lawsuits involving the drug Provigil® that Plaintiffs allege were resolved through reverse payment settlements. These settlements were entered into between Cephalon, Inc., a pharmaceutical company, and four generic drug manufacturers, all of whom are Defendants in the antitrust cases before the Court. Barr, the respondent to the motion at issue, is one of the four generic drug manufacturers.

Plaintiffs, who have filed the current motion, are members of one of several proposed classes and are referred to as "The King Drug Direct Purchaser Class." This class is comprised of companies who directly purchased Provigil® from Cephalon for re-distribution. Plaintiffs generally allege that the reverse payment settlements constitute an unlawful restraint of trade and have sued Cephalon, Barr and the three other generic companies for antitrust violations.

Plaintiffs have requested documents in discovery regarding communications that Barr had with its supplier, Chemagis. Barr explains that Chemagis "supplied the active pharmaceutical ingredient" ("API") modafinil. (Barr Memo., p. 3.) After Barr refused to produce certain documents, raising the community-of-interest privilege, Plaintiffs filed the motion before the Court.

I have reviewed, in camera, the eighteen documents alleged by Barr to be protected by the community-of-interest privilege. Generally, these documents relate to the settlement between Barr and Cephalon and how, financially, the settlement terms would affect Chemagis. The documents withheld were generated from December of 2005 through January of 2006. The settlement between

Barr and Cephalon occurred shortly thereafter on February 1, 2006.

The community-of-interest privilege raised by Barr has been described as allowing attorneys "representing different clients with similar legal interests to share information without having to disclose it to others." In re Teleglobe Commc'ns Corp., 493 F.3d 345, 364 (3d Cir. 2007). Barr justifies withholding the documents in question based upon several theories under this privilege. First, Barr asserts that the community-of-interest privilege applies because it shared a substantially similar legal interest with Chemagis as they jointly developed a generic version of Provigil® and thus both were at risk of being sued for infringement by Cephalon. See 32 U.S.C. § 271 (2006). Barr claims that application of this privilege applies even where one entity, here, Chemagis, was not a party to the patent litigation between Cephalon and Barr. (Barr Memo., p. 12.) Barr also presses an expansive application of the community-of-interest privilege which would not only protect communications between counsel for Barr and Chemagis but also communications between non-lawyer representatives of each party.[2] (Barr Memo., p. 10.)

Plaintiffs urge that the documents in question are discoverable for several reasons. Plaintiffs first posit that Chemagis's interests in the Cephalon/Barr patent litigation were purely "financial" and that a common "legal interest," which is required for the community-of-interest privilege to apply, did not exist between the two companies. (Pl. Memo., pp. 6-7.) Plaintiffs also stress that there was never a joint defense strategy between Barr and Chemagis, especially where Chemagis was never sued by Cephalon. (Pl. Memo., p. 7.) In support of this position, Plaintiffs point to documents and testimony in a related Federal Trade Commission ("FTC") investigation which allegedly reflect

---

[2] The privilege log supplied by Barr reflects that many of the communications at issue involved non-lawyers.

that Chemagis relinquished any control regarding legal strategy in the Cephalon/Barr patent litigation to Barr. (Pl. Memo., p. 8.) Plaintiffs also assert that many of the communications at issue do not involve attorneys from both Barr and Chemagis thus rendering the community-of-interest privilege inapplicable. (Pl. Memo., p. 11.)

In addition to the eighteen documents discussed above, Plaintiffs also argue that Barr has waived the attorney-client privilege regarding the settlement with Cephalon, and that "Barr must immediately allow discovery regarding such communications." (Barr Memo., p. 20.)

## II.  The Community-of-Interest Privilege

The United States Court of Appeals for the Third Circuit's most recent and comprehensive examination of the community-of-interest privilege was undertaken in Teleglobe, 493 F.3d 345.[3] There, the Court reviewed the evolution and rationale of the privilege:

> Recognizing that it is often preferable for co-defendants represented by different attorneys in criminal proceedings to coordinate their defense, courts developed the joint-defense privilege. In its original form, it allowed the attorneys of criminal co-defendants to share confidential information about defense strategies <u>without waiving the privilege as against third parties</u>. Moreover, one co-defendant could not waive the privilege that attached to the shared information without the consent of all others. Later, courts replaced the joint-defense privilege, which only applied to criminal co-defendants, with a broader one that protects all communications shared within <u>a proper "community of interest</u>," whether the context be criminal or civil.

Id., at 363-64 (emphasis added) (citations and footnotes omitted).

As it relates to the issues currently before me, the Teleglobe case articulated the following

---

[3] The Court's pronouncements in Teleglobe on the community-of-interest privilege were not dispositive to the outcome of the case. Moreover, some, but not all, of the Court's reasoning seemed to be premised on Delaware Rules of Evidence, 1 Paul R. Rice, Attorney-Client Privilege in the United States § 4:35 (2d ed. 2009); and/or the Restatement (Third) of the Law Governing Lawyers § 76 (2000). Nonetheless, the Court's examination of the community-of-interest privilege is instructive to my analysis.

principles regarding the community-of-interest privilege:

- "[T]he community-of-interest privilege allows attorneys representing different clients with similar legal interests to share information without having to disclose it to others." The privilege applies in civil and criminal litigation. Id. at 364.

- The privilege encompasses communications "shared with the attorney of the member of the community in interest." The privilege "is an exception to the disclosure rule" and "was developed to allow attorneys to coordinate their clients' criminal defense strategies." Id. at 364-65 (emphasis removed).

- Alleged members of the community of interest must at least share a "substantially similar legal interest," that is not solely commercial. Id. at 365.

**A. Did Barr and Chemagis Share a Substantially Similar Legal Interest or Was Their Shared Interest Centered on Financial Concerns?**

At the outset, I note that there has been some disagreement amongst courts regarding whether the shared legal interest needs to be "identical" or "substantially similar" in order for the privilege to apply. Although some courts have opined that the community-of-interest privilege only applies where the shared interest between the parties is "identical," the United States Court of Appeals for the Third Circuit has not applied this heightened standard. Compare Duplan Corp. v. Deering Milliken, Inc., 397 F.Supp. 1146, 1172 (D.S.C. 1974); Net2Phone, Inc. v. Ebay, Inc., No. 06-2469, 2008 WL 8183817, at *7 (D.N.J. June 26, 2008); Grider v. Keystone Health Plan Cent., Inc., No. 05-mc-40, 2005 WL 2030456, at *6 (M.D. Pa. July 28, 2005), with Teleglobe, 493 F.3d at 365. Rather, the Third Circuit has found that "it is sufficient to recognize that members of the community of interest must share at least a substantially similar legal interest." Teleglobe, 493 F.3d at 365.

Plaintiffs do not contest that Barr and Chemagis had a substantially similar interest in the Cephalon/Barr patent litigation. (Pl. Memo., p. 7.) Plaintiffs urge, however, that Barr and

5

Chemagis's substantially shared interest was primarily "commercial" or "financial," not legal. Courts examining this issue have indeed found that the shared interest must be "legal." See, e.g., Teleglobe, 493 F.3d at 365 (members of community-of-interest must share substantially similar legal interest); Net2Phone, 2008 WL 8183817, at *8 (shared interests must be legal, not solely commercial); Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 447 (S.D.N.Y. 1995) (privilege does not encompass joint business strategy which happens to include concern about litigation).[4]

In support of their claim that the shared interest between Barr and Chemagis was not legal, Plaintiffs first note that Chemagis was not sued in the Cephalon/Barr patent case and that Chemagis had no expectation that they would be sued. (Pl. Memo., p. 7.) I disagree with Plaintiffs on this point because as the supplier and joint developer of the generic version of Provigil®, Chemagis could have been liable for infringement pursuant to 35 U.S.C. § 271(a). Id. ("[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent therefor, infringes the patent."). Because the rationale behind the community-of-interest privilege doctrine protects communications by attorneys, undertaken to share information, and set up a common defense strategy, I will follow those cases that recognize the community-of-interest privilege even where one of the parties has not been sued. Teleglobe, 493 F.3d at 365 (in the community-of-interest context, the party receiving the privileged communication "may be a non-party to any anticipated or pending litigation") (quoting Duplan, 397 F. Supp. at

---

[4] I note that the privilege may apply even where communications included discussion of various business considerations, as long as the communication was "infused with legal concerns." Se. Pa. Transp. Auth. v. Caremarkpcs Health, L.P., 254 F.R.D. 253, 258 (E.D. Pa. 2008) (citations omitted).

1172); Haines v. Liggett Grp. Inc., 975 F.2d 81, 94 (3d Cir. 1992); Hanson v. U.S. Agency for Int'l Dev., 372 F.3d 286, 292 (4th Cir. 2004) (the community-of-interest privilege can apply even where there is no litigation in progress); Net2Phone, 2008 WL 8183817, at *7 (community-of-interest applicable to "potential," as well as actual, co-defendants); Johnson Elec. N. Am., Inc. v. Mabuchi N. Am. Corp., No. 88-7377, 1996 WL 191590, at *3-4 (S.D.N.Y. Apr. 19, 1996) (community-of-interest privilege applicable where one of the parties was a litigant and the other was a "potential target" of litigation). Thus, the fact that Chemagis was not a party in the Cephalon/Barr patent litigation does not defeat the privilege.

As to whether the joint interests of Barr and Chemagis were "legal" or "financial,", that question does not need to be answered because, as detailed below, even if the interests were "legal" there was never a joint, coordinated and ongoing defense strategy.

**B.     If Barr and Chemagis Did Have a Shared Legal Interest, Were the Statements at Issue Made as Part of an Ongoing, Joint, Coordinated Defense Strategy?**

Plaintiffs next argue that at the time the communications at issue were made - December 2005-February 2006, there was no "common," "coordinated" and/or "joint" legal strategy between Barr and Chemagis. (Pl. Memo., p. 7.) On this point, I agree with Plaintiffs.

In Haines, 975 F.2d 81, the Third Circuit Court of Appeals recognized that the privilege was designed to protect communications made as "part of an on-going and joint effort to set up a common defense strategy." Id. at 94 (emphasis added, internal quotation mark omitted). The Court ruled that in order for the community-of-interest privilege to apply, the party asserting the privilege must establish that: 1) the communications were made in the course of a joint defense effort; 2) the statement was designed to further the effort; and 3) the privilege has not been waived. Id.; see also

Robert Bosch LLC v. Pylon Mfg. Corp., 263 F.R.D. 142, 146 (D.Del. 2009) (communications must involve "on-going and joint" defense effort). For several reasons, I conclude that Barr is unable to meet these standards.[5]

First, the timing in which the documents were created does not support the fact that the communications were made as part of an ongoing, coordinated, legal defense strategy, or that the communications were made to further that effort. Barr and Chemagis entered into a supply agreement in August of 2001,[6] while the Cephalon/Barr patent litigation commenced in March of 2003 and continued for three years, settling in February of 2006. (Cephalon, Inc. v. Mylan Pharm., et al., 03-cv-1394 (D.N.J.).) Despite this three year lawsuit, where, presumably, some type of litigation activity occurred, Barr has presented very little evidence reflecting that it engaged Chemagis in any meaningful way in their defense of that case, particularly at the time when the statements at issue were made.

Barr relies heavily upon a "Joint Defense Agreement" entered into with Chemagis on February 19, 2003, just prior to the commencement of the Cephalon/Barr litigation. While this document does reflect Barr and Chemagis's intention to engage in a shared defense, nothing else in the record before me reflects that any actual concrete, tangible steps were taken to effectuate or implement that joint defense. A joint defense agreement, drafted in February of 2003, that recites terms such as "mutuality of interest in a common and joint defense" does not establish that

---

[5] The party asserting the privilege bears the burden of proving that it applies to the communications at issue. In re Grand Jury Empanelled Feb. 14, 1978, 603 F.2d 469, 474 (3d Cir. 1979).

[6] Barr spends some time in their brief explaining this agreement and the subsequent business dealing with Chemagis, but I view this evidence as undermining Barr's position in that such information tends to reflect a financial, not legal, shared interest. (Barr Memo., pp. 2-3.)

communications made two years later were part of a joint, ongoing, coordinated defense strategy.

Barr also relies on two e-mails between Barr and Chemagis representatives sent in early April of 2003, which discussed how the two companies would communicate regarding the status of the litigation. These documents were generated one month after the commencement of the Cephalon/Barr patent litigation but do not reflect that joint defense efforts between Barr and Chemagis were ever commenced or that such efforts continued through the course of the three year litigation and remained ongoing at the time the communications at issue were generated.[7] In fact, Barr concedes that "[a]t the same time the patent litigation proceeded," communications with Chemagis were "on the business side of their joint undertaking to develop a generic Provigil® product." (Barr Memo., p. 4 (emphasis added).)

Further, my review of the evidence presented to the FTC reflects that it was Chemagis's position that there was not an ongoing, joint or coordinated defense effort with Barr. This evidence includes several representations by Chemagis that the Barr/Cephalon patent litigation was completely controlled by Barr, as was the decision to settle. Indeed, Chemagis executives testified before the FTC that Chemagis was not actively involved in the Cephalon/Barr litigation.[8] (Pl. Memo., pp. 8-9.)

---

[7] Barr also points to other e-mails, which they claim demonstrate an ongoing, joint defense strategy with Chemagis. (Barr Memo., p. 14; O'Quinn Decl., Exs. E, F.) Specifically, the first few e-mails, written one month after the commencement of the lawsuit, generally discussed how a joint litigation strategy would progress. The other e-mail, dated approximately four years later, and well after the litigation had settled, pertained to a Chemagis patent.

[8] For example, in its presentation to the FTC, Chemagis represented that, according to its Supply Agreement with Barr, Barr would "direct and control" the litigation. Under the agreement, Chemagis would have no veto power, but would be entitled to half of any settlement. (Silverman Decl., Ex. J; Schaefer Ex. 27, p. 836.) However, Chemagis did not have the ability to compel a settlement, and "lacked any control over the Modafinil litigation and settlement." Id. at 853. Chemagis further represented that although Barr had an obligation to keep Chemagis informed about the litigation, it did so "minimally." Id. Additionally, when asked whether

Despite the fact that Chemagis's presentations to the FTC consistently reflect that Chemagis had no part in the defense of the Cephalon/Barr patent litigation, Barr urges that I ignore this evidence because, as Barr theorizes, Chemagis's attempts to downplay their role and their representations to the FTC were "self-interested, post hoc statements made in an effort to avoid an FTC lawsuit." (Barr Memo., p. 15.)  Barr only theorizes how they are able to discern with such assuredness what Chemagis's motives were in their presentations to the FTC regarding the Cephalon/Barr patent litigation.  Nonetheless, it remains un-refuted that Chemagis clearly and affirmatively disavowed having any input into Barr's litigation strategy, and there remains little, if any evidence to establish that at the time the communications at issue were made, Barr and Chemagis were engaged in an ongoing and coordinated legal defense.

The fact that Chemagis shared in Barr's legal costs, as set forth in the "Joint Defense Agreement," does little to bolster Barr's position in that, again, it does not establish an ongoing and coordinated legal defense.  In fact, an agreement to share litigation expenses could be viewed as more consistent with a financial oriented decision.  As noted previously, the policy behind the community-of-interest privilege is to encourage counsel to develop a joint defense strategy without fearing that their communications will be discoverable.  Barr has produced insufficient evidence establishing that the communications they seek to protect were made in that context.

---

Chemagis ever told Barr its "view" of the modafinil litigation, a Chemagis executive testified their company had little experience in the area, that Chemagis was "not involved," and that Chemagis "couldn't comment on something [it was] not apart [sic] of." (Silverman Decl., Ex. L, Kochan Dep., p. 43.)  This executive also emphasized that Chemagis was "in the dark" with respect to the Modafinil litigation, and that while Barr requested information from Chemagis, Barr was silent as to the merits or status of the lawsuit and that the litigation was "their [Barr's] game at the end of the day." Id.

### C. Does the Community-of-Interest Privilege Apply Solely to Communications Between Attorneys or Does it Extend to Communications Between the Parties?

My in camera review reflects that many of the documents in question, all of which are e-mails, were between counsel for either Barr or Chemagis and, in many instances, included executives (e.g., non-lawyers) from each company. (See Barr Privilege Log, Doc. Control No.'s, 363, 367, 384, 385, 399, 400, 404, 438, 461, 558, 560.) However, having found that the eighteen documents in question do not fall within the community-of-interest privilege and thus are discoverable, I need not reach the question as to the applicability of the privilege to communications with non-lawyers.

### III. Did Barr Waive the Attorney-Client Privilege Regarding the Cephalon/Barr Settlement?

In addition to the eighteen documents that Barr withheld as protected by the community-of-interest privilege, Plaintiffs request additional discovery of privileged information, asserting that Barr has waived its attorney-client privilege. Plaintiffs have focused on four specific, previously disclosed communications between Barr and Chemagis, which Plaintiffs assert reveal the legal opinions of Barr's attorneys. Based on these communications, Plaintiffs urge that they should be permitted to discover additional documents that relate to those opinions.[9]

#### A. Applicable Law

In order for an attorney-client privilege to apply, the primary purpose of the communication must be to receive or provide legal assistance. Se. Pa. Transp., 254 F.R.D. at 258; Kramer v. Raymond Corp., No. 90-5026, 1992 WL 122856, at *1 (E.D. Pa. May 29, 1992). Disclosure of attorney-client privileged communications waives the privilege with regard to the communications

---

[9] Plaintiffs specific request for further discovery is somewhat vague in that they do not identify particular documents to which they are entitled.

or portions of the communications actually disclosed. Teleglobe, 493 F.3d at 361. Any further waiver, implied from the initial disclosure, is bounded by a concept of fairness: a court will not impose a broader waiver than is necessary to undo an advantage gained by the party claiming the privilege. Id.; see also Westinghouse Elec. Corp. v. Republic of Phil., 951 F.2d 1414, 1426 n.12 (3d Cir. 1991) ("When a party discloses a portion of otherwise privileged materials while withholding the rest, the privilege is waived only as to those communications actually disclosed, unless a partial waiver would be unfair to the party's adversary."). If the disclosed communications were not privileged when they were made, disclosing them cannot constitute a waiver. See In re Chevron Corp., Nos. 10-4699, 11-1099, 2011 WL 2023257, at *10 (3d Cir. May 25, 2011) ("communications [that] were not made 'in confidence' . . . were not privileged to begin with, and there was no privilege to waive by their disclosure."). The party seeking to establish waiver bears the burden of proof. Brigham & Women's Hosp. Inc. v. Teva Pharm. USA, Inc., 707 F.Supp.2d 463, 469 (D.Del. 2010).

      **B.    The Communications At Issue**

As noted above, Plaintiffs point to four specific, previously disclosed statements, which they assert support their claim of waiver. I find that three of those statements are not attorney-client communications, and thus the disclosures do not operate as a waiver. Regarding the fourth communication, I find that even if that statement does constitute attorney-client material, any waiver of the privilege is limited to the portion of the communication already disclosed, while a broader waiver is unnecessary in the interest of fairness.

The first communication Plaintiffs identify is an e-mail sent by Chemagis executive, Bob Schaefer, in which he allegedly disclosed Barr's counsels' view as to the time-line for the launch of specific generics. This e-mail reads:

> Barr presented their thoughts on the competitive launch situation and who they believe will be the Generics on the market at launch. In this regard, they had two scenarios:
>
> 1) Barr and Teva (because of Mylan and Ranbaxy's choice to invalidate the P/S patent, Barr believe [sic] they will NOT be successful and so will NOT be on the market at the time of launch by other Generics and only Barr and Teva will be); and
>
> 2) Barr, Teva, and an authorized Generic . . . .

(Silverman Decl., Ex. A; Schaefer Ex. 4, p. 187.)

I find that this communication does not reveal Barr's attorney-client privileged information. The bulk of the communication addresses the issue of generic market entry, a matter of economic concern to both Barr and Chemagis. While some of this discussion could implicate legal matters (e.g., "Mylan and Ranbaxy's choice to invalidate the Plaintiff's patent"), the communication's primary purpose does not appear to be "to gain or provide legal assistance." Kramer, 1992 WL 122856, at *1. Rather, the communication provides Chemagis with a forecast of which generic, aside from Barr, that would enter the market. The attorney-client privilege is only implicated where "communications about business are 'infused with legal concerns.'" Faloney v. Wachovia Bank, N.A., 254 F.R.D. 204, 210 (E.D. Pa. 2008). (It is also not entirely clear to me that the communication in question was generated by Barr's counsel.) Because the communication relates to business concerns, prior disclosure cannot constitute a waiver of the privilege for any other documents.

The second communication is an e-mail from Sharon Kochan, also a Chemagis executive, reporting what Plaintiffs characterize as Barr's patent counsels' views of the Cephalon/Barr patent case. This communication states:

> Based on verbal feedback from Christine Siwik, Esq. who is representing Barr in the litigation on Modafinil, and therefore is very familiar with the specific case, it is very likely that all four "first wave" filing companies (Barr, Mylan, Teva and Ranbaxy)

13

> will be launching at risk prior to the end of the litigation process, legal process which may possibly extend beyond June 2006, the more likely possible launch date after pediatric exclusivity (assuming such exclusivity is granted).
>
> In view of the above, the forecast and subsequent orders of Barr (especially the one for January) seem way too aggressive . . . .

(Silverman Decl., Ex. N.; Schaefer Ex. 7, pp. 434-35.)

This communication contains no legal advice and pertains entirely to financial concerns regarding generic launch dates and product orders. The fact that it was "based on verbal feedback" from a lawyer cannot transform a business communication into a privileged one. Nor does it matter that the e-mail juxtaposes speculation about launch dates with the expected progress of the litigation. The communication, not being privileged, does not operate as a waiver.

The third communication that allegedly constitutes a waiver was also from Sharon Kochan, in a September 6, 2005, e-mail, which states:

> Just one point to clarify the issue related to Ms. Siwik and the possibility of four generic competitors Vs. just the "non infringing" player. I talked with Chris Mangler last week on another subject and used the opportunity to prompt this exact question. Barr [sic] view is that indeed it is most likely that all the four first generic filers will launch concurrently (as I have previously advised), and that most probably pediatric exclusivity will be granted.

(Silverman Decl., Ex. N; Schaefer Ex. 7, p. 430.) This communication, like the previous two referenced above, discusses little more than the potential launch scenarios for the generic manufacturers.[10] The conveyance of such information to Sharon Kochan does not constitute a waiver

---

[10] Moreover, the remainder of this e-mail, which Plaintiff did not include in their memorandum, makes the business purpose clearer:

> Nevertheless, given the huge upside in case one of the more optimistic scenarios materializes, from the operational perspective Barr insists (and rightly so) on being ready for such, even if the chances for these optimistic scenarios are low. On the balance of risk reward I completely agree with Barr's approach.
>
> In any case, as you also concluded, even if our view was different than Barr's (which

14

of the privilege.

The fourth e-mail relied upon by Plaintiff is from Bob Schaefer, who reported Barr's "opinion" on the patent litigation and potential damages, as conveyed by Mike Bogda, a Barr executive. This e-mail states:

> At the very end of the discussion and prior to his leaving for another meeting, Mike brought up the possibility of "at risk launch" and referred to the possibility of Damages being awarded if the courts find in favor of Cephalon. In Barr's opinion, the possibility of the court's ruling in favor of Cephalon over the P/S patent are low, but should they find in favor of Cephalon the damages would NOT be treble, but SINGLE in this case. Mike asked that we make everyone aware of this, and if need be to have the Agis (Perrigo) Counsel discuss with Barr's Counsel.

(Silverman Decl., Ex. A; Schaefer Ex. 4, p. 189.)

First, it is unclear whether this communication represents disclosure of attorney-client privileged information, or the general view of Barr executives. Indeed, although there is a reference to a court ruling and damages, typically legal matters, there is no direct reference that the communication came directly from Barr's counsel. Assessments of the merits of Cephalon's patent suit could be the product of attorney-client communication or could represent the views of business people. As a manufacturer of generic pharmaceuticals, Barr executives are undoubtedly independently familiar with the basics of patent litigation.

Nonetheless, I recognize this particular communication may include legal-type information and a reference to future discussions among counsel. However, even if the disclosure constitutes a waiver, I find that fairness limits the waiver to the statements actually disclosed. There is no

---

> is not the case), we must respect Barr's request being that they are closer to the market, plus they are our partner, so we must prepare operationally to meet the more optimistic forecast, or at minimum 1,600kg for the validation and launch preparation (800kg in October and 800kg in November).

(Silverman Decl., Ex. N; Schaefer Ex. 7, p. 430.)

evidence here that Barr was attempting to engage in strategic disclosure, or sought to selectively disclose privileged materials so as to "present a one-sided story to the court." Westinghouse Elec. Corp., 951 F.2d at 1426 n.12.  Unlike in Brigham & Women's, 707 F.Supp.2d at 471, there is also no claim that Barr is trying to use the privilege as both a sword and shield.  Although the communication does forecast Barr's prediction regarding the outcome of the Cephalon/Barr litigation, that discussion is tied to an "at risk launch," a business decision, and seems not to be focused on providing legal assistance.  I thus conclude that it is not unfair to Plaintiffs to allow Barr to withhold the remainder of genuinely privileged documents that may form the basis for this statement.

**IV.     Conclusion**

For the reasons discussed above, the eighteen documents withheld by Barr do not satisfy the community-of-interest privilege and thus are discoverable.  Additionally, Barr has not waived the attorney-client privilege regarding attorney communications.

An appropriate Order follows.