IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KING DRUG COMPANY OF FLORENCE, INC., et al., | CIVIL ACTION |
| Plaintiffs, | |
| v. | No. 2:06-cv-1797 |
| CEPHALON, INC., et al., | |
| Defendants. | |

**Goldberg, J.**                                                                                   January 9, 2014

## Memorandum Opinion

The issue before us is whether a finding of fraud on the Patent Office implicates the crime-fraud exception to the attorney-client privilege.

Plaintiffs, the Direct Purchasers, are a putative class of companies that purchased the wakefulness drug Provigil directly from Defendant Cephalon for redistribution. In an opinion dated October 31, 2011, in the related case of Apotex, Inc. v. Cephalon, Inc., No. 06-2768, we concluded that Cephalon had committed inequitable conduct (sometimes called fraud on the Patent Office) in the prosecution of its patent for Provigil (the RE '516 patent) through its "complete concealment of another company's extensive involvement in the product which is the subject of the claimed invention." Apotex, Inc. v. Cephalon, Inc., 2011 WL 6090696, at *27 (E.D. Pa. Nov. 7, 2011), aff'd 500 Fed. Appx. 959 (Fed. Cir. 2013), cert. denied, 2013 WL 5565876 (Dec. 16, 2013). Direct Purchasers' motion to compel asserts that the findings in that opinion establish the applicability of the crime-fraud exception to the attorney-client privilege,

1

rendering discoverable thousands of communications between Cephalon and its attorneys relating to the patent prosecution and other events in the years that followed.

Having heard oral argument and after careful review of the written submissions, we conclude that the Direct Purchasers have failed to show that a reasonable basis exists to believe that the communications they identify were made in furtherance of the alleged fraud. In so finding, we also decline to review in camera any of the documents at issue.

I.      **Factual Background**

This is one of numerous consolidated antitrust cases alleging, among other things, that Cephalon and several generic manufacturers of Provigil violated the Sherman Act when they agreed to settle infringement litigation on terms that provided for significant payments from Cephalon to the generics. The facts relevant to this motion are primarily those relating to the prosecution of Cephalon's Provigil patent, and are recounted at length in our <u>Apotex</u> opinions.

In deciding the questions of invalidity and unenforceability, we made several determinations regarding Cephalon's conduct in the prosecution of the patent. The patent claimed, most relevantly, a "pharmaceutical composition comprising a substantially homogenous mixture of modafinil [the active ingredient in Provigil] particles, wherein at least 95% of the cumulative total of modafinil particles in said composition have a diameter less than about 200 microns." We concluded that Cephalon did not invent that pharmaceutical composition. In fact, a French company, Laboratoire L. Lafon, manufactured and shipped to Cephalon several modafinil batches between 1989 and 1993 that fell within the patent claims. Nevertheless, Cephalon filed its initial patent application in October 1994, and filed the application that resulted in the RE '516 patent in 1999. In prosecuting the RE '516 patent (and its predecessor), Cephalon did not disclose to the Patent Office that another company was the inventor of the drug, or that Cephalon

had done nothing to alter the modafinil it received. To the contrary, Cephalon falsely suggested that it had "manipulate[d] the particle size of the drug substance" to reach the levels described by the patent claims. Our opinion determined that Cephalon acted with "specific intent to deceive the PTO," and that its misrepresentations and omissions were material. We found that Apotex proved these allegations by clear and convincing evidence.

 Direct Purchasers' ask us to conclude that these findings are sufficient to establish the crime-fraud exception to the attorney-client privilege, and seek an order directing Cephalon to produce all attorney-client communications related to: (1) the prosecution, issuance, and reissuance of the RE '516 patent; (2) the listing of the patent in the FDA's Orange Book; (3) the filing and maintaining of patent infringement litigation against the generics; and (4) the negotiation and making of reverse-payment settlement agreements with the generics. Cephalon responds that, even if its prior misrepresentations and omissions establish fraud with respect to the patent prosecution, there is no justification for concluding that the fraud extended through the other events identified by the Direct Purchasers. Cephalon further contends that the Direct Purchasers have failed to meet their burden to show that any of its communications with its attorneys were made "in furtherance" of the alleged fraud. Because we agree with Cephalon, we will deny the Direct Purchasers' motion.

## II. Discussion

The attorney-client privilege is the oldest confidential communications privilege known to the common law, and one that has long been regarded as "worthy of maximum legal protection." Haines v. Ligget Grp., 975 F.2d 81, 89 (3d Cir. 1992). For that reason, the decision to pierce the privilege is regarded as an "extreme remedy," to be made only after due consideration and caution. Unigene Labs. v. Apotex, Inc., 655 F.3d 1352, 1359 (Fed. Cir. 2011).

The United States Court of Appeals for the Third Circuit has emphasized that "where a fact finder undertakes to weigh evidence in a proceeding seeking an exception to the privilege, the party invoking the privilege has the <u>absolute right</u> to be heard by testimony and argument." Haines, 975 F.2d at 97 (emphasis added).

The privilege is subject to several exceptions. Importantly, as it relates to this case, the privilege does not protect communications made between an attorney and a client in furtherance of a future crime or fraud. As aptly explained by Justice Benjamin Cardozo: "A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told." Clark v. United States, 289 U.S. 1, 15 (1933). To pierce the privilege, the movant "must demonstrate that there is a reasonable basis to suspect (1) that the privilege holder was committing or intending to commit a crime or fraud, and (2) that the attorney-client communication or attorney work product was used in furtherance of that alleged crime or fraud." In re Grand Jury, 705 F.3d 133, 155 (3d Cir. 2012).

### A.   Level of Proof Required

The precise level of proof required to succeed on a motion to compel based on the crime-fraud exception is subject to some debate. The traditional definition requires the party invoking the exception to provide "prima facie evidence that it has some foundation in fact." Clark, 289 U.S. at 15. But "prima facie" is a slippery standard, and the Supreme Court has since recognized that it has resulted in "some confusion" among the lower courts. United States v. Zolin, 491 U.S. 554, 563 n.7 (1989).

In the civil context, the United States Court of Appeals for the Third Circuit has concluded that the prima facie case requires the movant to "present evidence which, if believed by the fact-finder, would be sufficient to support a finding that the elements of the crime-fraud

4

exception were met." Haines, 975 F.2d at 95-96. The Haines court also quoted opinions from other circuits interpreting prima facie to mean "probable cause" or a "reasonable basis" to believe that the elements of the exception were met. Id. at 95. The court suggested that these formulations amounted to the "same basic proposition," id., and more recent Third Circuit law has adopted the "reasonable basis" language, albeit in the grand-jury context, In re Grand Jury, 705 F.3d at 153-54. Under that formulation, the privilege is destroyed "[w]here there is a reasonable basis to suspect that the privilege holder was committing or intending to commit a crime or fraud and that the attorney-client communications or attorney work product were used in furtherance of the alleged crime or fraud" Id. at 153. We use the reasonable basis language here, with the understanding that each of the terms mentioned above amount to essentially the same level of proof in this context. See Haines, 975 F.2d at 95-96.

In recognition of the reality that many abuses of the privilege would be impossible to prove without examination of the communications at issue, a "lesser evidentiary showing is needed" to permit a judge to exercise his discretion to review the documents in camera. Zolin, 491 U.S. at 569-70. To make in camera review permissible, the movant must produce sufficient evidence to "support a reasonable belief that in camera review may yield evidence that establishes the exception's applicability." Id. at 574-75; see also In re Chevron Corp., 633 F.3d 153, 167 (3d Cir. 2011) (holding that movant had not met burden to establish crime-fraud exception's applicability, but had met the burden to justify in camera review). However, even if this threshold showing is made, in camera review is not required. A judge has discretion to conclude that prudential concerns, such as the "volume of materials the district court has been asked to review," the "relative importance to the case of the alleged privileged information," and

5

the "likelihood that evidence produced through in camera review . . . will establish that the crime-fraud exception does apply," render in camera review unwise. Zolin, 491 U.S. at 572.

      **B.**      **Fraud Element**

To satisfy the first element of the exception, the movant must show common law fraud. Unigene Labs., 655 F.3d at 1358-59. This requires (1) misrepresentation or omission of a material fact, (2) an intent to deceive, (3) justifiable reliance by the party deceived, and (4) injury to the party deceived. Id.

Until recently, it was clear that a finding of inequitable conduct (as was found in Apotex) was insufficient by itself to establish common law fraud. See In re Spalding Sports Worldwide, Inc., 203 F.3d 800, 807 (Fed. Cir. 2000) (distinguishing inequitable conduct as requiring a lesser showing of intent than fraud). Courts routinely denied crime-fraud motions to compel on this basis. See, e.g., WebXChange Inc. v. Dell, Inc., 264 F.R.D. 123, 129 (D. Del. 2010) (noting that movant's arguments were "little more than a restatement of their inequitable conduct allegations, which are insufficient for a prima facie showing of fraud"); Rowe Int'l Corp. v. Ecast, Inc., 241 F.R.D. 296, 303-04 (N.D. Ill. 2007).

The Direct Purchasers argue that this changed in Therasense, Inc. v. Becton, Dickinson and Co., 649 F.3d 1276 (Fed. Cir. 2011), where the Federal Circuit reassessed the standards for a finding of inequitable conduct. Specifically, the court concluded that, to establish inequitable conduct, the "accused infringer must prove [by clear and convincing evidence] that the patentee acted with the specific intent to deceive the PTO," and that the patent would not have issued "but-for" the deception. Id. at 1290-91. We applied this heightened standard in Apotex v. Cephalon, and concluded that Cephalon committed inequitable conduct in prosecuting the RE '516 patent. The Direct Purchasers' posit that Therasense aligned the inequitable conduct

standard with the common law fraud standard, and thus our findings in Apotex suffice to establish the fraud element of the crime-fraud exception.

While Cephalon disputes this point, it focuses most of its opposition on the second, "in furtherance" element of the crime-fraud exception. (See Resp. 7 ("[E]ven assuming arguendo the Court's inequitable conduct finding could establish a prima facie case of fraud as to the patent prosecution . . . .").) Because we conclude that the second "in furtherance" element has not been met, we need not decide the meaning and import of Therasense here, and leave that for another day. Cf. In re Chevron Corp., 633 F.3d at 167 ("[E]vidence of a crime or fraud, no matter how compelling, does not by itself satisfy both elements of the crime-fraud exception.").

### C. In Furtherance Element

The "in furtherance" element requires the movant to show that a given communication was "meant to facilitate future wrongdoing by the client." Haines, 975 F.2d at 90 (emphasis added). It is only those communications that the exception renders discoverable. Evidence tending only to show that a communication "relates to" or would provide "relevant evidence" of fraudulent conduct is insufficient. See In re Richard Roe, 68 F.3d 38, 40 (2d Cir. 1995) (holding that "relevant evidence" test was insufficient to show that the communications were "intended in some way to facilitate or conceal the criminal activity"); LRC Elecs., Inc. v. John Mezzalingua Assocs., Inc., 974 F. Supp. 171, 180 (N.D.N.Y. 1997) (rejecting crime-fraud argument after in camera review where communications "d[id] not mention" the material prior art alleged to be fraudulently concealed from the PTO).

In urging that the thousands of communications made between Cephalon and its attorneys were in furtherance of a fraud, the Direct Purchasers have offered nothing more than a broad categorical approach. They identify four events—the patent prosecution, the listing of the patent

7

in the Orange Book, the bringing and maintaining of the infringement litigation, and the settlements with the generic defendants—and assert that "all the attorney client communications relating to" these categories were necessarily made "in furtherance" of fraud. (Br. 17.)

We are not prepared, based upon such an over-broad and general approach, to override the attorney-client privilege. The Direct Purchasers are not entitled to every attorney-client communication made during the patent prosecution, or even every attorney-client communication related to the patentability of the modafinil composition that is the subject of the RE '516 patent (to take just one category of documents). Rather, they must establish that Cephalon sought the advice of its attorneys intending that the resulting advice would be used to facilitate a future fraud. Haines, 975 F.2d at 90. Despite the fact that thousands of discoverable documents have been exchanged and numerous depositions have been taken, the Direct Purchasers have been unable to patch together any type of record to establish that the communications at issue were in furtherance of future fraud. Moreover, the Direct Purchasers' categorical approach offers no way of distinguishing between communications made in furtherance of future fraud (if they exist), and those that legitimately relate to the patent prosecution. Accordingly, we conclude that the Direct Purchasers have fallen far short of meeting their burden of demonstrating a reasonable basis to conclude that particular communications were made in furtherance of the fraud they allege.

D.   **In Camera Review**

Based upon the record before us, we also conclude that in camera review would be inappropriate. The Direct Purchasers invite the Court to conduct an in camera review of a "limited selection" of documents—more than 800—that they claim "appear to relate to the challenged conduct." (Br. 17-18.) As we have already discussed, mere relation to the fraudulent

conduct does not meet the reasonable basis test. But even on the lower standard for obtaining in camera review, the Direct Purchasers' motion falls short. Many of the documents at issue are sure to remain privileged given the motion's broad request, making even the more limited intrusion on the privilege occasioned by in camera review quite substantial for Cephalon.

Moreover, the prudential concerns mentioned in Zolin make this motion an impractical prospect for in camera review. Review of even the selection of documents identified by the Direct Purchasers would consume considerable Court resources. While the evidence obtained, even if determined to be unprotected, might be useful in some respects, the breadth of the request reduces the likelihood that any given communication will be found to fall within the exception, and increases the harm to Cephalon from having a third-party, even if it is the Court, comb through its privileged communications. We thus decline to require Cephalon to produce any of the challenged communications for in camera review.

### III.   Conclusion

We conclude that the Direct Purchasers have failed to meet their burden of showing a "reasonable basis" that the attorney-client communications identified were made "in furtherance" of the alleged fraud, and further determine that in camera review would be inappropriate on this record. We acknowledge that Direct Purchasers may not have access to the evidence required to overcome the privilege, or to justify in camera review. But erring on the side of caution is part of the system that provides attorney-client communications with "maximum legal protection." Haines, 975 F.2d at 89.

An appropriate order follows.