## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KING DRUG COMPANY OF FLORENCE, INC., et al., : : Plaintiffs, : : v. : : CEPHALON, INC., et al., : : Defendants. : | : : : : : : : : : : : | CIVIL ACTION  No. 2:06-cv-1797 |
| VISTA HEALTHPLAN, INC., et al., : Plaintiffs, : : v. : : CEPHALON, INC., et al., : Defendants. : | : : : : : : : : : : | CIVIL ACTION  No. 2:06-cv-1833 |
| APOTEX, INC., : Plaintiff, : : v. : : CEPHALON, INC., et al., : Defendants. : | : : : : : : : : : : | CIVIL ACTION  No. 2:06-cv-2768 |

## **ORDER**

**AND NOW**, this 27th day of March, 2015, upon consideration of the "Motion of the Mylan Defendants' for Reconsideration of the Court's January 28, 2015 Order and Memorandum Opinion Denying Summary Judgment" (Dkt. No. 06-1797, Doc. No. 744; Dkt.

1

No. 06-1833, Doc. No. 396; Dkt. No. 06-2768, Doc. No. 849), and the responses in opposition,[1] I find as follows:

1. Defendants Mylan Laboratories, Inc. and Mylan Pharmaceuticals, Inc. ("Mylan") assert that my January 28, 2015 Opinion and Order denying their motion for summary judgment contains a "clear mistake of fact" because I relied upon a single document that does not create a genuine dispute of material fact as to whether the settlement agreement at issue was anticompetitive. Mylan primarily focuses on one section of that Opinion pertaining to evidence that Plaintiffs had proffered to rebut Mylan's procompetitive justifications for the product development agreements for fentanyl and naltrexone patches. The alleged clear mistake of fact is as follows: "According to a Mylan financial projection prior to the settlement agreement, Mylan predicted that the option agreement for the fentanyl patch was worth $41.8 million to Mylan and negative $11.6 million to Cephalon." <u>King Drug Co. of Florence, Inc. v. Cephalon, Inc.</u>, 2015 WL 356913, at *16 (E.D. Pa. Jan. 28, 2015). This projection was referenced by me as evidence from which a factfinder could determine that the fentanyl product development agreement, entered into as part of the patent settlement in question, had a negative impact on Cephalon and thus could be considered by a factfinder as evidence of a pretextual, "unexplained" agreement.

---

[1] These responses include: "Direct Purchaser Class Plaintiffs' Response in Opposition to Mylan Defendants' Motion for Reconsideration of the Court's January 28, 2015 Order and Opinion Denying Motion for Summary Judgment," "Apotex's Response in Opposition to Mylan Defendants' Motion for Reconsideration of the Court's January 28, 2015 Order and Opinion Denying Motion for Summary Judgment," "End-Payor Plaintiffs' Opposition to Mylan's Motion for Reconsideration," "Plaintiff Federal Trade Commission's Response to Mylan Defendants' Motion for Reconsideration of Denial of Summary Judgment in the Related Cases" and "Individual Plaintiffs' Opposition to Mylan's Motion for Reconsideration of the Court's January 28, 2015 Order and Opinion Denying Motion for Summary Judgment."

2. Mylan asks for reconsideration, alleging that this projection was "badly misconstrued" and that the actual document reflects a "positive $10.8 million net present value to Cephalon." (Mylan's Mot., pp. 3-4.)

3. The purpose of a motion for reconsideration made pursuant to Federal Rule of Civil Procedure 59(e) "is to correct manifest errors of law or fact or to present newly discovered evidence." Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999) (quoting Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985)). A motion for reconsideration must rely upon one of the following grounds: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted [a] motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." Id. (citing N. River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir. 1995)).

4. Mylan's motion for reconsideration will be denied because, even if the document in question is not subject to any interpretation other than one reflecting a positive net value to Cephalon, there remain other facts of record from which a factfinder could conclude that the reverse-payment settlement between Cephalon and Mylan was unjustified and an unreasonable restraint on competition.

5. For instance, no matter how the fentanyl production numbers shake out, or how the document in question is interpreted (See Mylan's Mot., Ex. A), a disputed fact remains as to whether Mylan was to receive a much larger percentage of the projected value of the fentanyl option agreement than Cephalon. (See Myers Dep., pp. 137-38 (upon reviewing the Mylan forecast, stating that "80% of the Net Present Value would fall under Mylan").) Plaintiffs have also pointed to facts which could establish that Cephalon paid

3

Mylan $20 million in nonrefundable disbursements prior to conducting any due diligence. (Pls.' Comb. SUF ¶¶ 379, 383, 390-91, 393.) A factfinder could also conclude that the collaboration agreements were entered into on the same day as the patent settlement agreement and were terminated three years later, after Cephalon had paid Mylan $45 million but had received no revenue from the projects. (Id. at ¶¶ 388, 402-03.)

6. Moreover, in response to Paragraph No. 382 of Plaintiffs' Statement of Uncontested Material Facts, which noted Mylan's projection that Cephalon would receive a negative value for the fentanyl option agreement, Defendants responded that "the cited document was a conservative forecast for fentanyl and it was one of many analyses that were done." (Defs.' Resp. to Pls.' Comb. SUF ¶ 382.)  At no point in Defendants' response to this statement of fact did Mylan specifically argue that the negative $11.6 million figure was incorrect, aside from saying that the document "speaks for itself."  (Id.) Finally, as noted in the January 28, 2015 Opinion, Cephalon also determined that the fentanyl product development agreement likely had a negative net present value for Cephalon.  (Id. at ¶ 384.) All of these facts, viewed in the light most favorable to the non-moving party, create a genuine factual dispute regarding whether the settlement agreement between Cephalon and Mylan was unjustified and anticompetitive.

7. Finally, I note that nowhere in its "Reply Memorandum in Support of Motion of Mylan Defendants for Summary Judgment on All Claims under FTC v. Actavis" did Mylan attempt to address or clarify the projection document in question. While this is not entirely dispositive of Mylan's current motion to reconsider, Mylan's failure to address this document, relied upon by Plaintiffs as a disputed fact, does not add to the strength of

Mylan's position that a "clear mistake of fact" was made in denying Mylan's motion for summary judgment.

**WHEREFORE**, for the reasons set forth above, Mylan's Motion for Reconsideration (Dkt. No. 06-1797, Doc. No. 744; Dkt. No. 06-1833, Doc. No. 396; Dkt. No. 06-2768, Doc. No. 849) is **DENIED**.

                                          **BY THE COURT:**

                                          **/s/ Mitchell S. Goldberg**

                                          _____
                                          **Mitchell S. Goldberg**