**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KING DRUG COMPANY OF FLORENCE, INC., : | CIVIL ACTION |
| et al., : | |
| Plaintiffs, : | |
| : | |
| v. : | No. 2:06-cv-1797 |
| : | |
| CEPHALON, INC., et al., : | |
| Defendants. : | |

Goldberg, J.                                                    July 27, 2015

<u>**MEMORANDUM OPINION**</u>

Presently before me is the Direct Purchaser Class Plaintiffs' motion for class certification filed in this consolidated antitrust lawsuit known as the <u>In re Modafinil Litigation</u>.[1]  The prospective class of Direct Purchasers include drug wholesalers that purchased the brand-name drug, Provigil, directly from Defendant, Cephalon, Inc., at any time between June 24, 2006 and August 31, 2012.

Plaintiffs have brought this antitrust lawsuit against the manufacturer of Provigil, Cephalon, Inc., as well as four generic pharmaceutical companies: Teva Pharmaceutical Industries, Ltd. and Teva Pharmaceuticals USA, Inc. ("Teva"); Ranbaxy Laboratories, Ltd. and Ranbaxy Pharmaceuticals, Inc. ("Ranbaxy"); Mylan Pharmaceuticals, Inc. and Mylan Laboratories, Inc. ("Mylan"), and Barr Laboratories, Inc. ("Barr") (collectively "Generic

---

[1] The other cases consolidated within the <u>In re Modafinil Litigation</u> are <u>Vista Health Plan, Inc., et al. v. Cephalon, Inc., et al.</u> (Dkt. No. 06-1833) and <u>Apotex, Inc. v. Cephalon, Inc., et al.</u> (Dkt. No. 06-2768).  Only the Direct Purchaser Class Plaintiffs' case is implicated by the instant motion for class certification.  Therefore, I will refer to these Direct Purchasers as Plaintiffs herein.

1

Defendants").[2]  At the center of this case are four Hatch-Waxman reverse-payment settlements, executed in 2005 and 2006 between Cephalon and each of the Generic Defendants, which are alleged to be anticompetitive for delaying the market entry of generic Provigil.

Plaintiffs seek class certification under Federal Rule of Civil Procedure 23(b)(3), and assert that all of the requirements of Rule 23 have been satisfied.  Defendants vigorously oppose certification and primarily urge that Plaintiffs have failed to demonstrate the requirements of numerosity, predominance and superiority.

For the reasons that follow, I find that Plaintiffs have satisfied all of the relevant Rule 23 requirements, and thus, that class certification is appropriate.  Accordingly, Plaintiffs' motion will be granted.

## I.    FACTUAL AND PROCEDURAL HISTORY

### A.  Overview of the In re Modafinil Litigation

In April 1997, the U.S. Patent and Trademark Office issued U.S. Patent No. 5,618,845 ("the '845 patent") to Cephalon, which patented a specific formulation of modafinil known as Provigil, a wakefulness-promoting drug.  In 2002, Cephalon was granted a reissue patent on Provigil, U.S. Patent No. RE 37,516 ("the RE '516 patent"), which was scheduled to expire October 6, 2014.  As a result of studying the drug's effects on children, Cephalon also received an additional six months of pediatric exclusivity on Provigil, extending Cephalon's exclusivity period through April 6, 2015.

---

[2] Plaintiffs have reached a settlement agreement with Defendants Cephalon, Teva, and Barr, and have filed an "Unopposed Motion for Certification of a Settlement Class, Appointment of Class Counsel, Preliminary Approval of Proposed Settlement, Approval of the Form and Manner of Notice to the Class and Proposed Schedule for a Fairness Hearing."  (Doc. No. 795.)  That motion is currently pending.  Therefore, the instant motion for certification of a litigation class only pertains to Defendants Mylan and Ranbaxy.

On December 24, 2002, all four Generic Defendants filed Abbreviated New Drug Applications ("ANDAs") for generic Provigil, each certifying that Cephalon's patent was either invalid or would not be infringed by their generic modafinil product.  As first-filers, all of the Generic Defendants were entitled to share in 180 days of exclusive marketing upon FDA approval, a characteristic of the Hatch-Waxman Act, Pub. L. No. 98-417.  As a result of the Generic Defendants' ANDA filings, Cephalon sued the Generic Defendants for patent infringement on March 28, 2003.

All of the litigation between Cephalon and the Generic Defendants was settled between December 2005 and February 2006, while motions for summary judgment were pending.  The settlements each permitted the Generic Defendants to launch their generic Provigil product on a "date certain" prior to the expiration of the RE '516 patent—April 6, 2012.  The agreements further contained "contingent-launch provisions," which permitted each Generic Defendant to market generic Provigil prior to the date certain if any other company marketed generic Provigil, whether through a license or at-risk,[3] or if the RE '516 patent was declared invalid, unenforceable, or not infringed by generic Provigil.  Each of these settlement agreements contained provisions for and/or were signed alongside licenses for intellectual property, active pharmaceutical ingredient supply agreements, and pharmaceutical development agreements.

---

[3] Launching "at risk" means that a company has chosen to market its generic product, despite the fact that it is actively being accused of patent infringement and the court has not yet determined whether the patent is valid or has been infringed.  Under the Hatch-Waxman Act, when a patent holder files an infringement lawsuit within forty-five days of an ANDA containing a certification that the patent is invalid or not infringed, the FDA may not approve the ANDA for thirty months. If the case is resolved during the thirty-month stay, the FDA will take action on the ANDA consistent with the court's judgment.  However, if the case is still ongoing at the end of the thirty-month stay, the FDA may approve the ANDA, at which point the generic company may choose to launch at risk.  If the infringement lawsuit is eventually resolved in favor of the patent holder, the generic company may owe damages for its at-risk launch.  King Drug Co. of Florence, Inc. v. Cephalon, Inc., 2015 WL 356913, at *2 (E.D. Pa. Jan. 28, 2015) (citing 21 U.S.C. § 355(j)(5)(B)(iii)); Federal Trade Commission v. Actavis, Inc., 133 S. Ct. 2223, 2228 (2013)).

Cephalon agreed to pay a total of approximately $300 million to the Generic Defendants as a result of these agreements.[4]  Plaintiffs allege that but-for these payments, the Generic Defendants would have launched generic Provigil at risk, and thus lower-cost generic competition would have been brought to the prospective class members by June 2006.

Each of these settlement transactions have been characterized by Plaintiffs as anticompetitive, reverse-payment settlement agreements that violate the antitrust laws.  See Federal Trade Commission v. Actavis, Inc., 133 S. Ct. 2223 (2013).

### B.  Facts Pertinent to Class Certification

Plaintiffs argue that this case presents questions of fact and law that are common to the class as a whole, and thus, class treatment is appropriate.  Regarding Defendants' alleged anticompetitive conduct, Plaintiffs suggest that most, if not all, of those inquiries will be focused on Defendants' conduct and would not vary from class member to class member.  (See Pls.' Combined State. of Fact, Doc. No. 643.)

As to the issues of antitrust impact and damages, Plaintiffs rely upon the expert testimony of economist Jeffrey J. Leitzinger, Ph.D. to demonstrate that these elements can be satisfied through proof at trial that is common to the class.  Dr. Leitzinger presents opinions regarding the alleged overcharges to the class, which he calculates by subtracting the cost of lower-priced generic forms of Provigil, which Plaintiffs allege would have been available absent Defendants' anticompetitive conduct, from the cost paid by Plaintiffs for branded Provigil.  (Leitzinger Exp. Rep., Apr. 26, 2011, ¶ 104.)  Had generic Provigil been available sooner, Dr. Leitzinger opines that all or virtually all of the class members would have purchased some quantity of the generic,

---

[4] Additional details regarding these settlement agreements and the Hatch-Waxman administrative framework may be found at this Court's Memorandum Opinion addressing Defendants' motions for summary judgment on Plaintiffs' Actavis claims.  See King Drug Co. of Florence, Inc., 2015 WL 356913, at *1-5.

which in turn would have resulted in significant savings to the class.  (Id. at ¶ 11.)  He bases these conclusions on the following: (1) government and academic research showing that generics have a lower cost and are quickly substituted for brands upon availability; (2) Defendants' internal analyses that predicted that generic Provigil would replace 90% of brand sales and be priced 90% lower than branded Provigil; and (3) the fact that Plaintiffs are mostly wholesalers who stock generics whenever available due to their high demand.  (Id. at ¶¶ 46-59, 98-99.)  In his supplemental report, Dr. Leitzinger also incorporates data derived from generic Provigil's real-world generic entry in March 2012.  (Leitzinger Supp. Exp. Rep., Dec. 20, 2013, ¶¶ 11-23.)  Dr. Leitzinger asserts that aggregate overcharges may be calculated using evidence common to the class. (Leitzinger Exp. Rep., Apr. 26, 2011, ¶ 101.)

Defendants present competing testimony from their expert, Dr. James A. Ordover, who opines that joinder of absent class members is not impracticable, and thus that Plaintiffs have not met the numerosity requirement.  (Ordover Exp. Rep., June 10, 2011, ¶¶ 12-14.)  Dr. Ordover further opines that "generic bypass" would cause individualized inquiries among the class members to predominate common issues.  Dr. Ordover explains that generic bypass occurs when Direct Purchasers, such as Plaintiffs, lose a substantial amount of business and profits after generic entry.  According to Dr. Ordover, prior to generic entry, retail entities tend to purchase brand-name drugs exclusively from drug wholesalers like Plaintiffs.  However, upon generic entry, large retail entities tend to purchase generic drugs directly from generic manufacturers as opposed to wholesalers.  (Ordover Exp. Rep., June 10, 2011, ¶¶ 58-62.)  Therefore, while entities further down the distribution chain purchase brand-name pharmaceuticals almost exclusively from Direct Purchasers, those same Direct Purchasers may lose a substantial amount of business once the generic drug enters the market.  According to Dr. Ordover, "some class members—

namely those class members that sell substantial volumes to self-warehousing customers—would have seen their sales volume of Provigil decline substantially and replaced by a much smaller volume of generic [Provigil] sales after generic entry." (Id. at ¶ 55.) Dr. Ordover opines that generic bypass may have varying effects from one class member to another, requiring individualized analysis that makes this case improper for class treatment. (Id. at ¶ 57.)[5]

### C.  Proposed Class Definition

Direct Purchasers seek certification of the following class:

> All persons or entities in the United States and its territories who purchased Provigil in any form directly from Cephalon at any time during the period from June 24, 2006 through August 31, 2012.

The class definition excludes Defendants, and their officers, directors, management, employees, subsidiaries, or affiliates, and all federal governmental entities. According to Direct Purchasers, there are 22 members of the proposed class.

### II.  STANDARD OF REVIEW

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Wal-Mart Stores v. Dukes, 131 S. Ct. 2541, 2550 (2011) (quoting Califano v. Yamasaki, 442 U.S. 682, 700-01 (1979)) (quotation marks omitted). In order to certify a class action, the plaintiffs bear the burden of proving by a preponderance of the evidence that the putative class satisfies all of the prerequisites identified in Federal Rule of Civil Procedure 23(a) and one of the subcategories of Rule 23(b). Fed. R. Civ. P. 23; In re

---

[5] Dr. Ordover also devotes a significant amount of his initial report asserting that lost profits, not overcharges, is the appropriate measure of impact or damages in this case. However, Defendants have not pressed these opinions in their briefing, which is likely due to the United States Court of Appeals for the Third Circuit's determination that lost profits are not the relevant injury. See In re K-Dur Antitrust Litig., 686 F.3d 197, 221 (3d Cir. 2012) vacated on other grounds, Upsher-Smith Labs., Inc. v. Louisiana Wholesale Drug Co., Inc., 133 S. Ct. 2849 (2013) ("a plaintiff suffers an antitrust injury where it is overcharged for a product, regardless of whether it can show lost profits") (citation omitted).

Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 320 (3d Cir. 2008).  "[P]roper analysis under Rule 23 requires rigorous consideration of all the evidence and arguments offered by the parties."  Hydrogen Peroxide, 552 F.3d at 321.  "[T]he court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action."  Id. at 307.  "Weighing conflicting expert testimony at the certification stage is not only permissible; it may be integral to the rigorous analysis Rule 23 demands."  Id. at 323 (citations omitted).

> Subsection (a) of Rule 23 contains four prerequisites for any class action:
>
> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

For certification under Rule 23(b)(3), the movant must also demonstrate "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  These requirements are known as predominance and superiority.  Hydrogen Peroxide, 552 F.3d at 310.[6]

---

[6] In addition to these requirements, there are two "essential prerequisite[s]" to class certification under Rule 23(b)(3): (1) a "clearly defined class and set of claims, issues, or defenses to be given class treatment"; and (2) "the class must be currently and readily ascertainable based on objective criteria."  Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 592-93 (3d Cir. 2012) (citations omitted).

"[T]he text of the order or an incorporated opinion must include (1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues, or defenses to be treated on a class basis."  Id. at 591 (quoting Wachtel v. Guardian Life Ins. Co., 453 F.3d 179, 187 (3d Cir. 2006)).  Clearly defining the contours of the class ensures that parties have clarity, and that class

### III.   **LEGAL ANALYSIS**

#### A.   **Numerosity**

The numerosity prerequisite requires a plaintiff to show by a preponderance of the evidence that the proposed class is so numerous that joinder of all absent class members would be impracticable.   In re Wellbutrin XL Antitrust Litig., 2011 WL 3563385, at *2-3 (E.D. Pa. Aug. 11, 2011).   This analysis largely "depends on the circumstances surrounding the case and not merely on the number of class members."   Jackson v. SEPTA, 260 F.R.D. 168, 185-86 (E.D. Pa. 2009).   While there is no precise number required to satisfy the numerosity requirement, the United States Court of Appeals for the Third Circuit has made the following observations:

> [w]hile there are exceptions, numbers under twenty-one have generally been held to be too few.   Numbers between twenty-one and forty have evoked mixed responses and again, while there are exceptions, numbers in excess of forty, particularly those exceeding one hundred or one thousand have sustained the requirement.

Weiss v. York Hosp., 745 F.2d 786, 808 n.35 (3d Cir. 1984) (citing 3B J. Moore, Moore's Federal Practice ¶ 23.05[1], at 23-150 (2d ed. 1982)).

"In addition to the number of class members, other factors that are relevant to determining the impracticability of joining all members include (1) judicial economy, (2) geographic dispersion, (3) financial resources of class members, (4) the claimants' ability to

---

members understand their rights and make informed opt-out decisions.   Id. at 591-92. Defendants have not challenged Plaintiffs' class definition.   I agree that the class definition is clearly defined.

"The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'"   Byrd v. Aaron's Inc., 784 F.3d 154, 163 (3d Cir. 2015) (quoting Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 355 (3d Cir. 2013)).   "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate."   Marcus, 687 F.3d at 593.   Defendants have not argued that Plaintiffs' class is not ascertainable, and Plaintiffs note that they have identified all potential class members using Cephalon's records.   Therefore, I find that the class is currently and readily ascertainable.

institute individual suits, and (5) requests for injunctive relief that could affect future class members." In re Wellbutrin XL, 2011 WL 3563385, at *3 (citation omitted). For joinder to be impracticable it need not be impossible; rather, the plaintiff must show that joinder would be extremely difficult or inconvenient. Jackson, 260 F.R.D. at 186 (quoting Szczubelek v. Cendant Mortgage Corp., 215 F.R.D. 107, 116 (D.N.J. 2003)).

Plaintiffs assert that the proposed class contains twenty-two class members. While the proposed class is not especially large, Plaintiffs point to a number of cases in the antitrust context where classes containing twenty to thirty members have been found to meet the numerosity requirement. See Mylan Pharms., Inc. v. Warner Chilcott Public Ltd. Co., 2014 WL 631031, at *2 (E.D. Pa. Feb. 18, 2014) ("Doryx") (twenty-three class members satisfy numerosity where geographically disparate);[7] In re Nexium (Esomeprazole) Antitrust Litig., 296 F.R.D. 47, 52 (D. Mass. 2013) (class of twenty-four to twenty-nine meets numerosity requirement where geographically disparate); In re Prograf Antitrust Litig., 2013 WL 2395083, at *1 (D. Mass. 2013) (twenty-five members meets numerosity, where litigation is complex and members geographically disparate); In re Wellbutrin XL, 2011 WL 3563385, at *3-4 (same as to thirty-three class members); Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd., 246 F.R.D. 293, 306-07 (D.D.C. 2007) (same for twenty-nine to thirty class members).

Defendants dispute that there are twenty-two class members, and present various arguments as to why they believe the accurate number is eighteen. Defendants further point to precedent stating that classes under forty are subject to increased scrutiny, and numerosity is

---

[7] Defendants argue that Doryx is not relevant to the question of numerosity because it involved the certification of a class for the purposes of settlement, which they assert raises different considerations and issues. However, the court in Doryx conducted an analysis of the Rule 23 factors, and did not indicate that any special standard for numerosity was being applied. Furthermore, the Third Circuit has held that there is no lesser numerosity standard for settlement classes. In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 798-99 (3d Cir. 1995).

generally not met where there are twenty or fewer class members.  See Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001) (generally forty or more class members will satisfy numerosity); Weiss v. York Hosp., 745 F.2d 786, 808 n.35 (3d Cir. 1984) (numerosity generally not satisfied where the class has fewer than twenty-one members).

        1.   The Appropriate Number of Class Members

Because relevant precedent makes significant distinctions between classes containing more than twenty class members and those containing twenty or fewer, I will first consider the parties' arguments regarding the four disputed class members.

        a.  *Meijer and LaFrance SAJ*

Defendants argue that proposed class members Meijer and LaFrance SAJ ("SAJ") should not be considered for numerosity purposes because they are assignees of two other class members, Frank Kerr and McKesson.  Defendants posit that including these entities in the total class number would allow Plaintiffs to "double dip" and artificially inflate the number of class members to establish numerosity.  Defendants further note that Plaintiffs' expert, Dr. Leitzinger, initially left Meijer and SAJ out of the total class number, but later included them.  (Compare Leitzinger Exp. Rep., Apr. 26, 2011, Ex. 3 with Leitzinger Supp. Exp. Rep., Dec. 20, 2013, Ex. 3.)

The only precedent Defendants cite for the proposition that assignees cannot be included in the total number of prospective class members arises from a case in the bankruptcy context, where the parties were subject to statutes not at issue here.  See In re Evans, 1997 Bankr. LEXIS 1073, at *9-10 (Bankr. E.D. Va. June 6, 1997) (for the purposes of counting the number of creditors under 11 U.S.C. § 303(b)(1), "additional creditors could not be created by making a partial assignment of a single claim").  As Plaintiffs note, the Third Circuit has recognized an

assignees' right to pursue an antitrust claim in a class action.  See In re Fine Paper Litig., 632 F.2d 1081, 1090-91 (3d Cir. 1980) (recognizing right to partially assign claims, and finding assignee to be a necessary member of the class); see also In re Nexium, 296 F.R.D. at 53-54 (assignees may be included within a proposed class and meet adequacy requirement); In re Relafen Antitrust Litig., 346 F. Supp. 2d 349, 368-70 (D. Mass. 2004) (holding assignees could sue for overcharges in the place of direct purchasers).

While Defendants raise a valid concern that a plaintiff could potentially artificially inflate the number of class members for numerosity purposes through the use of assignments, that concern does not translate into evidence that Plaintiffs have manipulated the number of class members here.  (See Oral Arg. Tr., Mar. 26, 2015, pp. 59-62 (defense counsel acknowledging that there is no evidence that assignments were made to artificially inflate the number of class members).)  Furthermore, it is undisputed that the assignments to Meijer and SAJ are valid and that the assignments allow them to pursue claims for the alleged antitrust violations.  Without any evidence that Plaintiffs have attempted to artificially inflate the number of class members, and noting that many courts have included assignees within the class without concern, I find that Meijer and SAJ should be included in the total number of class members for numerosity purposes.

b. *King Drug*

Defendants also dispute the class membership of named Plaintiff King Drug, which ceased operations prior to generic entry, and therefore never actually purchased generic Provigil.  As such, Defendants argue there is no way to know whether King Drug would have purchased generic Provigil if it had been available prior to 2012.  In support of this argument, Defendants point to delayed-generic entry antitrust cases where courts excluded prospective class members

that did not make real-world generic purchases. See K-Dur, 686 F.3d at 220 n.13; In re Wellbutrin XL, 2011 WL 3563385, at *13.

Plaintiffs respond that a Rule 30(b)(6) witness for King Drug testified at deposition that King Drug would have purchased generic Provigil had it been available. (See Elmore Dep., p. 151 ("Q. And if a generic version of Provigil had come on the market, would King Drug have purchased that product?  A. Yes.").)  As a result of this evidence, Plaintiffs assert that a jury could find that King Drug was overcharged because it would have purchased the generic in the but-for world.  Further, Plaintiffs distinguish K-Dur and Wellbutrin XL, arguing that the class members in those cases were excluded because they chose not to purchase the generic after generic entry.  That is not the case here.  I agree with Plaintiffs that there is sufficient evidence to demonstrate that King Drug would have purchased generic Provigil in the but-for world. Therefore, I find that King Drug should be counted as a class member for numerosity purposes.[8]

### c. *Drogueria Betances*

Defendants further dispute the class status of Drogueria Betances ("Drogueria"), which made all of its branded Provigil purchases after generic Provigil had already entered the market. Defendants argue that without any branded Provigil purchases prior to generic entry, Drogueria did not experience any overcharges.

Plaintiffs respond that the overcharges caused by the reverse-payment settlements did not instantly cease when generic Provigil entered the market, as it takes time for the full effects of generic competition to occur.  Plaintiffs explain that a class member may be overcharged in the

---

[8] To the extent that including King Drug as a class member would give rise to individualized evidence on the issue of whether it would have purchased generic Provigil, that individualized evidence would be minimal and would not defeat predominance.  See Amgen Inc. v. Conn. Retirement Plans & Trust Funds, 133 S. Ct. 1184, 1196 (2013) (individual questions need not be absent, so long as common questions predominate).

time that it takes for the prices to reach competitive levels.  Dr. Leitzinger addressed this issue in his expert reports, opining that "the generic price advantage generally continues to grow over time until an equilibrium point is reached."  (Leitzinger Exp. Rep., Apr. 26, 2011, ¶ 50.) Defendants' expert, Bruce Stangle, Ph.D., also recognized that it takes some time for market prices to reach competitive levels following generic entry.[9]  (Stangle Dep., pp. 82-86.)

Drogueria bought branded and generic Provigil in April 2012, one month after generic Provigil reached the market.  As both experts acknowledged, it takes at least several months, if not longer, for the prices of branded and generic Provigil to reach fully competitive levels.  As the evidence demonstrates that the prices were still falling at the time of Drogueria's purchases, and thus Drogueria may have been subject to an overcharge, I find that Drogueria should be included as a class member for numerosity purposes.

As a result of the above findings, I conclude that the proposed class contains twenty-two members.

---

[9] Dr. Stangle's testimony on this issue was as follows:

> Q. Dr. Stangle, you mentioned something earlier that it takes some time after generic entry for prices to reach a competitive level.  Do you recall that?
> A. Yes.
> Q. Does it also take some time for the generic substitution rate to reach its maximum level?
> A. Yes, it does.
> Q. And why does it take some time for the generic substitution rate to reach its maximum level after generic entry occurs?
> A. The market needs to adjust to a new supplier or set of suppliers, so there may be contracts in place that would delay the impact of a new supplier.  There could be a whole host of reasons why it takes a while for the impact of new generics to be fully reflected in market prices and sales.

(Stangle Dep., pp. 82-83.)

2.   <u>Impracticability of Joinder of the Direct Purchaser Class</u>

Having resolved the dispute regarding the number of class members, I next consider whether Plaintiffs have established that joinder is impracticable, such that class treatment would be appropriate. As previously noted, the relevant considerations on this issue include "(1) judicial economy, (2) geographic dispersion, (3) financial resources of class members, (4) the claimants' ability to institute individual suits, and (5) requests for injunctive relief that could affect future class members."[10]  <u>In re Wellbutrin XL</u>, 2011 WL 3563385, at *3.

Plaintiffs focus heavily on the geographic differences among class members, which they argue would make joinder difficult, inconvenient and costly.  The class members are citizens of thirteen different states and Puerto Rico.  (<u>See</u> Leitzinger Supp. Exp. Rep., Dec. 20, 2013, ¶ 8 n.11, Ex. 3.)  Plaintiffs also argue that certain absent class members may not be incentivized to bring a suit on their own, and may even be fearful of doing so because they have an ongoing working relationship with Defendants.  Although they do not provide any evidence to establish fear of retaliation, Plaintiffs cite to other pharmaceutical antitrust class actions that have found such retaliation.  <u>See</u> <u>Rochester Drug Coop., Inc. v. Braintree Labs.</u>, 796 F. Supp. 2d 560, 567 (D. Del. 2011) ("there is no dispute that defendant at bar terminated its business relationship with plaintiffs specifically as a result of plaintiffs' pursuit of litigation"); <u>Bergen Drug Co. v. Parke, Davis & Co.</u>, 307 F.2d 725, 727-28 (3d Cir. 1962) (finding the defendant had terminated its business relationship with the plaintiff in retaliation for filing an antitrust suit).

Defendants respond that Plaintiffs bear the burden of proving that joinder is impracticable, and urge that Plaintiffs have not provided evidence to meet that burden. Defendants point out that each class member is a financially successful drug wholesaler that has

---

[10] Neither party addresses the fifth prong of this test.  Review of Plaintiffs' second amended complaint reveals that they do not seek injunctive relief.

the financial resources and incentive to pursue its own claims.  As to geographic dispersion, Defendants assert that this one factor is insufficient to show impracticability of joinder, and that sophisticated entities are capable of coordinating nationwide litigation.  Finally, Defendants argue that there is no evidence to support Direct Purchasers' theory that some class members fear retaliation.

Considering the extensive history of this litigation and the exhaustive discovery that has been conducted, I conclude that judicial economy is best served by trying this case as a class action.  Joinder of the absent class members would likely require additional rounds of discovery, which would only further delay a trial date.  Further, if cases were brought within other jurisdictions, additional discovery is certainly a possibility, and separate trials could result in inconsistent verdicts.  See In re Wellbutrin XL, 2011 WL 3563385, at *3 (finding impracticability of joinder where discovery "delays and other complications would be greatly increased if all direct purchasers were joined in this suit"); In re K-Dur Antitrust Litig., 2008 WL 2699390, at *3 n.4 (D.N.J. Apr. 14, 2008) (citing Meijer, Inc., 246 F.R.D. at 306-07) ("judicial economy would be served by resolving the common issues raised in this case in a single action, rather than 38 individual ones").

Plaintiffs have also demonstrated that the class members are geographically diverse, which has the potential to create problems if all class members were to join the litigation.  It is undisputed that the prospective class members are spread out over thirteen states and Puerto Rico.  The considerable geographic dispersion of the parties would certainly present challenges to Plaintiffs in attempting to coordinate the litigation if all class members were joined, particularly if additional discovery was required.  See In re Wellbutrin XL, 2011 WL 3563385, at *3 ("class members' geographic dispersion would cause substantial difficulty for the parties to . .

. coordinate the litigation"); In re K-Dur, 2008 WL 2699390, at *3 n.4 (relying on geographic diversity in finding numerosity satisfied); Doryx, 2014 WL 631031, at *2 (same).  Therefore, geographic dispersion weighs in favor of a finding that joinder is impracticable.

Two factors that may weigh against Plaintiffs are the financial resources of the class members and the parties' abilities to bring individual suits.  Plaintiffs do not dispute that the prospective class members are all sophisticated corporations that have experience conducting litigation.  Additionally, while Plaintiffs argue that the ongoing business relationships between the class members and Defendants warrants certifying a class due to fear of retaliation, there is no evidence to support Plaintiffs' theory.

Plaintiffs do convincingly respond, however, that some of the prospective class members' claims are relatively small, such that there may not be an economic incentive to engage in expensive antitrust litigation.  For example, using data derived from Defendants' economic expert, Dr. Ordover, six class members may have claims below $1 million.  (See Ordover Supp. Exp. Rep., Ex. 1; Pls.' Reply, p. 9 n.36.)  These prospective class members likely do not have the same incentive to engage in costly antitrust litigation on their own.

The complexity and extensive history of this case, the expansive discovery conducted, and the geographic dispersion of the parties all favor class treatment.  While some factors weigh in Defendants' favor, I find those factors less compelling.   Accordingly, Plaintiffs have demonstrated by a preponderance of the evidence that the parties are sufficiently numerous so as to make joinder impracticable.

## B.  Commonality and Typicality

Defendants largely do not dispute that commonality and typicality prerequisites have been satisfied.  The commonality requirement is met where the class members' claims "depend

upon a common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  Dukes, 131 S. Ct. at 2551.  "Because the requirement may be satisfied by a single common issue, it is easily met."  Baby Neal v. Casey, 43 F.3d 48, 56 (3d Cir. 1994).  "The typicality inquiry is intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." Baby Neal, 43 F.3d at 57 (citations omitted).  Typicality exists "[i]f the representative's claims and those of the absent class members arise from the same course of conduct and are based on the same legal theories . . . regardless of factual differences underlying the individual claims."  In re Wellbutrin XL Antitrust Litig., 282 F.R.D. 126, 138 (E.D. Pa. 2011) (citing Baby Neal, 43 F.3d at 57-58).  Plaintiffs point to common evidence of Defendants' conduct that would be needed to prove antitrust violations, and which would be replicated in numerous trials if the class was not certified.  In light of the common evidence and legal theories surrounding Plaintiffs' claims, I find that Plaintiffs have satisfied the requirements of commonality and typicality.

### C.  Adequacy of Representation

The final Rule 23(a) requirement, adequacy of representation, has two prongs: (1) "the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation"; and (2) "the plaintiff must not have interests antagonistic to those of the class." Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239, 247 (3d Cir. 1975) (citation omitted).  The adequacy requirement necessitates that the court consider whether conflicts of interest exist between named parties and those they represent.  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997).  Defendants do not dispute the qualifications and experience of Plaintiffs'

counsel, who have litigated numerous class action cases in the antitrust context.  See *About the Firm*, GARWIN GERSTEIN & FISHER LLP, http://www.garwingerstein.com (last visited July 27, 2015).  However, Defendants assert that generic bypass creates a conflict among class members because some class members benefitted from delayed generic entry.

In support of their conflict argument, Defendants cite to Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170 (3d Cir. 2012), where the court found a conflict of interest among class members.  Defendants also point out that the Dewey court cited Valley Drug Co. v. Geneva Pharmaceuticals, Inc., 350 F.3d 1181, 1189 (11th Cir. 2003), a case that found a conflict of interest due to generic bypass.

The conflict of interest found in Dewey is very different from the instant case in that Dewey considered the certification of a settlement class in a products liability suit involving motor vehicles.  That settlement agreement separated class members into two groups: (1) a reimbursement group, wherein class members received the right to reimbursement, paid from a fund; and (2) a residual group, which could only collect from the fund after the reimbursement group made its claims.  Dewey, 681 F.3d at 173.  The court was concerned that all of the representative class members belonged to the reimbursement group and had an interest in maximizing their own recovery at the expense of the residual group class members.  Id. at 187.  While the court did cite Valley Drug, it did so for the uncontroversial proposition that "[a] fundamental conflict exists where some [class] members claim to have been harmed by the same conduct that benefitted other members of the class."  Id. at 184.  Dewey certainly did not endorse Valley Drug's determination regarding generic bypass.  Further, in K-Dur, the court explicitly rejected Valley Drug, and found there was no conflict of interest due to generic bypass.  See K-

Dur, 686 F.3d at 223 (rejecting <u>Valley Drug</u>'s conclusion that generic bypass creates a conflict of interest among drug wholesalers).

As will be discussed in more detail herein, in <u>K-Dur</u>, the Third Circuit definitively held that generic bypass does not prevent Direct Purchasers from establishing an antitrust injury, and therefore, Defendants' argument that some class members are benefitted while others are injured is without merit.  <u>Id.</u> at 220-21 (citing <u>Hanover Shoe, Inc. v. United Shoe Mach. Corp.</u>, 392 U.S. 481, 492-95 (1968)) (generic bypass does not negate antitrust impact because "a plaintiff suffers an antitrust injury where it is overcharged for a product, regardless of whether it can show lost profits").  It would contravene Third Circuit precedent to say that generic bypass causes some class members to benefit from the alleged anticompetitive conduct.  <u>See id.</u>  To the extent that generic bypass should be considered at all, it would appear to only have the potential to influence the amount of damages.  <u>Compare</u> <u>In re Relafen</u>, 346 F. Supp. 2d at 368-69 (the plaintiffs could seek damages for the full amount of the overcharge, despite the defendants' evidence of generic bypass) <u>with</u> <u>In re Nexium</u>, 296 F.R.D. at 56 ("the issue of generic bypass primarily affects the measure of damages").

The hypothetical conflict raised by Defendants regarding apportionment of damages is insufficient to defeat certification on adequacy grounds.  <u>In re Cardizem CD Antitrust Litig.</u>, 200 F.R.D. 326, 337 (E.D. Mich. 2001); <u>see also</u> <u>Kohen v. Pac. Inv. Mgmt. Co. LLC</u>, 571 F.3d 672, 680 (7th Cir. 2009) ("To deny class certification now, because of a potential conflict of interest that may not become actual, would be premature").  "Each class member has the same interest in maximizing the aggregate amount of classwide damages."  <u>In re Cardizem</u>, 200 F.R.D. at 337 (quoting <u>In re NASDAQ Market-Makers Antitrust Litig.</u>, 169 F.R.D. 493, 513 (S.D.N.Y. 1996)) (quotation marks omitted).  Insofar as Defendants argue that Plaintiffs' damages calculations

would vary based upon generic bypass, "[s]uch hypothetical conflicts regarding proof of damages are not sufficient to defeat class certification at this stage of the litigation." <u>Meijer, Inc.</u>, 246 F.R.D. at 304 (quoting <u>In re NASDAQ Market-Makers</u>, 169 F.R.D. at 513).  Therefore, I find that Plaintiffs have met their burden of establishing adequacy of representation.

### D.  <u>Predominance</u>

The predominance requirement considers "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." <u>Windsor</u>, 521 U.S. at 623.  In order to certify a class under Rule 23(b)(3), "questions of law or fact common to class members [must] predominate over any questions affecting only individual class members." Fed. R. Civ. P. 23(b)(3).  While commonality and predominance present similar considerations, the predominance standard is "far more demanding." <u>Hydrogen Peroxide</u>, 552 F.3d at 311 (citations omitted).

"Rule 23(b)(3) requires a showing that <u>questions</u> common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." <u>Amgen Inc. v. Conn. Ret. Plans & Trust Funds</u>, 133 S. Ct. 1184, 1191 (2013) (emphasis in original).  Individual questions need not be absent, so long as common questions predominate.  <u>Id.</u> at 1196.

When conducting a predominance inquiry, the court must consider the elements of the underlying cause of action.  <u>In re Flonase Antitrust Litig.</u>, 284 F.R.D. 207, 219 (E.D. Pa. 2012) (quoting <u>John Fund, Inc. v. Halliburton Co.</u>, 131 S. Ct. 2179, 2184 (2011)).  In order to prevail on their antitrust claims, Plaintiffs must prove: (1) a violation of the antitrust laws; (2) individual injury resulting from the violation, also known as antitrust impact; and (3) measurable damages. <u>See</u> <u>Hydrogen Peroxide</u>, 552 F.3d at 311.

Defendants largely do not dispute that the evidence Plaintiffs would present at trial to establish a violation of the antitrust laws would be common to the class. Such evidence would focus almost exclusively on Defendants' conduct, and would not vary amongst Plaintiffs. Instead, Defendants argue that Plaintiffs are not able to demonstrate antitrust impact or damages using class-wide evidence because determining whether a particular Direct Purchaser was harmed and/or the extent of that harm will necessitate individualized inquiries.

　　　　　1.　Antitrust Impact

"In antitrust cases, impact often is critically important for the purposes of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof." Hydrogen Peroxide, 552 F.3d at 311 (citations omitted). "[T]he task for plaintiffs at class certification is to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." Id. at 311-12. To resolve this issue, the court must conduct a "rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove impact at trial." Id. at 312 (citations omitted).

Plaintiffs offer the reports and deposition testimony of Dr. Leitzinger to establish antitrust impact for the class using common evidence. Dr. Leitzinger relies upon four primary categories of evidence common to the class to support his opinion of class-wide overcharges: (1) government and academic research demonstrating that the price of a pharmaceutical drops substantially upon generic entry and that purchasers substitute generics for the brand; (2) evidence that the brand itself may reduce its price upon generic entry; (3) Defendants' internal analyses, which expected generic Provigil to be significantly less expensive and capture a large percentage of Provigil sales; and (4) the data derived from after generic entry occurred in

2012, which further demonstrates that prices fell and generic substitution occurred in the actual world.  (Leitzinger Exp Rep., Apr. 26, 2011, ¶¶ 42-43, 46-59, 97-100; Leitzinger Supp. Exp. Rep., Dec. 20, 2013, ¶¶ 8, 15.)

Defendants briefly claim in a footnote that antitrust impact cannot be proven on a class-wide basis due to generic bypass.  As they argued with respect to adequacy of representation, Defendants maintain that generic bypass caused some Plaintiffs to benefit from later generic entry, as opposed to suffer any antitrust injury.  Therefore, Defendants posit that individualized inquiry into whether a class member was injured will overwhelm common evidence, defeating predominance.  However, as previously noted, the Third Circuit has squarely disagreed with Defendants' assertion.  K-Dur, 686 F.3d at 220-21.

The court in K-Dur addressed the defendants' argument that "in order to prove actual injury from delayed generic entry, plaintiffs must first produce evidence of lost profits"—which would take into consideration whether the plaintiffs had been affected by generic bypass.  The court disagreed, finding "[d]efendants' lost profits argument [ ] unavailing because it is simply a version of the so-called 'passing-on defense' that was rejected by the Supreme Court" in Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 581 (1968).  Id. at 220-21.  Dismissing the defendants' argument, the Third Circuit determined that "a plaintiff suffers an antitrust injury where it is overcharged for a product, regardless of whether it can show lost profits."  Id. at 221 (citing Hanover Shoe, 392 U.S. at 492-94).  This is because "requiring plaintiffs to show lost profits was too burdensome on both courts and litigants and would undercut the effectiveness of private antitrust suits as an enforcement mechanism."  Id. (citing Hanover Shoe, 392 U.S. at 492-94).  Generic bypass does not prevent the "fact of injury," which

occurs when plaintiffs are overcharged due to anticompetitive practices.   Thus, I am not convinced by Defendants' initial predominance argument.

Additionally, during oral argument on this motion, Defendants raised a supplemental argument that Plaintiffs had failed to establish predominance as to antitrust impact based upon my grant of summary judgment in Defendants' favor on Plaintiffs' claims for overall conspiracy. See King Drug Co. of Florence, Inc. v. Cephalon, Inc., 2014 WL 2813312 (E.D. Pa. June 23, 2014).  A brief background on this ruling is necessary to understand Defendants' argument.

In their second amended complaint, Plaintiffs had alleged that Cephalon and the Generic Defendants had all conspired together to keep generic Provigil off of the market and to share in the generated monopoly profits.  Id. at *4.  In support of their claim for overall conspiracy, Plaintiffs pointed to the 180-day period of exclusivity shared by the Generic Defendants, as well as the substantially identical contingent launch provisions[11] found within each of the settlement agreements.  Id.  Defendants had argued that each Generic had an individual incentive to demand a contingent launch provision, and that Plaintiffs' circumstantial evidence was insufficient to establish an overarching conspiracy as a matter of law.  Id.  I agreed with Defendants, holding that the private plaintiffs had not provided direct evidence of an overall agreement encompassing Cephalon and all of the Generic Defendants, nor had they presented circumstantial evidence that supported "an inference of concerted, as opposed to independent, action."  Id. at *14. Accordingly, summary judgment was granted in Defendants' favor as to Plaintiffs' claims of overall conspiracy.  Id.

---

[11] As previously noted, the contingent launch provisions within each agreement permitted each Generic Defendant to market generic Provigil prior to the date certain if any other company marketed generic Provigil, whether through a license or at-risk, or if the RE '516 patent was declared invalid, unenforceable, or not infringed by generic Provigil.

As a result of this decision, Defendants now assert that Plaintiffs are required to identify which class members suffered an injury under a specific bilateral agreement in order to establish antitrust impact and standing.   Assuming that Plaintiffs are able to establish anticompetitive conduct as to a specific Generic, Defendants argue that a class member would only suffer an antitrust injury if that class member would have purchased generic Provigil from that specific Generic Defendant in the but-for world.   (Oral Arg. Tr., Mar. 26, 2015, pp. 83-84; Doc. No. 793.)   For example, if a Direct Purchaser would have purchased generic Provigil from Ranbaxy in the but-for world, but only the agreement between Mylan and Cephalon is ultimately found to be anticompetitive, Defendants urge that the chain of causation would be too attenuated to establish antitrust injury as to that Plaintiff.   Thus, according to Defendants, the individualized inquiries that would result from this analysis would defeat predominance.

In support of this theory, Defendants cite to the Third Circuit's ruling in Mid-West Paper Products Co. v. Continental Group, 596 F.2d 573 (3d Cir. 1979).   There, the defendants, manufacturers of paper bags, were accused of price fixing in violation of the antitrust laws.   Id. at 575.   One of the plaintiffs, Murray, had not purchased paper bags from any of the defendants, but instead had purchased the products from some of the defendants' competitors who had allegedly taken advantage of the higher prices in the marketplace by raising their own prices.   Id. at 580-81.   Murray argued that it could sue the defendants for treble damages because there was a causal connection between the inflated prices it had paid to the defendants' competitors and the price-fixing scheme entered into by the defendants.   Id.   The Third Circuit disagreed and held that "Murray, in its role as a purchaser of consumer bags from competitors of the defendants, has no standing to sue the defendants for treble damages allegedly resulting from such purchases."   Id. at 587.   In reaching its decision, the court relied upon the following premise:

> Murray is not in a direct or immediate relationship to the antitrust violators: The defendants secured no illegal benefit at Murray's expense; their tainted gains were reaped from those firms to which they actually sold their products; and Murray's added costs, if any, were pocketed by defendants' competitors, who presumably were free to charge a lower price if they so desired.

Id. at 583.

Plaintiffs convincingly distinguish Mid-West Paper Products, emphasizing that the plaintiff in that case had made no direct purchases from any defendant, which deprived the plaintiff of standing.  Here, the class members have all purchased Provigil directly from Cephalon, a Defendant and signatory to every settlement agreement that is at the center of this case.  The alleged overcharge, or antitrust injury, occurred when Plaintiffs purchased Provigil from Cephalon at an artificially inflated price.  If either Mylan or Ranbaxy, or both, are ultimately found liable for antitrust violations based on their agreements with Cephalon, they would have necessarily contributed to maintaining the monopolistic price that caused Plaintiffs' injuries.  For these reasons, I do not find Defendants' standing argument convincing.

Mid-West Paper Products is also distinguishable because none of the defendants in that case secured an illegal benefit at the plaintiff's expense.  Here, if a reverse-payment settlement agreement is ultimately found to be anticompetitive under the rule of reason, Cephalon, as the manufacturer of Provigil, would have obtained an illegal benefit in the form of overcharges from Plaintiffs.  Because each Generic received substantial money from Cephalon allegedly in exchange for agreeing to stay off of the market, any Generic Defendant found liable would also have obtained an illegal benefit.  If Mylan, for example, is found liable for anticompetitive conduct under Actavis, a jury would have necessarily determined that Mylan received a large and unjustified payment from Cephalon that induced Mylan to keep its generic product off of the market.  See King Drug Co. of Florence, Inc., 2015 WL 356913, at *8-12 (Actavis rule of reason

analysis requires plaintiff to establish that the payment was large and defendant bears the burden of justifying the payment).  As the Supreme Court noted in <u>Actavis</u>, that large and unjustified payment would have been funded by the monopoly profits that Cephalon obtained from all Plaintiffs through its Provigil sales.  <u>See</u> <u>Actavis</u>, 133 S. Ct. at 2235 ("The payment may instead provide strong evidence that the patentee seeks to induce the generic challenger to abandon its claim with a share of its monopoly profits that would otherwise be lost in the competitive market").  Therefore, if Mylan is ultimately found liable for an <u>Actavis</u> violation, it would have secured an illegal benefit at Plaintiffs' expense, regardless of whether any particular Plaintiff would have purchased generic Provigil directly from Mylan.  Thus, individualized inquiry into which generic manufacturer each class member favored is unnecessary.

For all of the reasons expressed above, I find that Dr. Leitzinger's class-wide evidence regarding the effects of generic competition, and evidence that all class members either purchased or would have purchased generic Provigil, satisfies the predominance requirement as to antitrust impact.

## 2.  Antitrust Damages

With respect to damages, Plaintiffs assert that they have met their burden of establishing predominance because aggregate damages can be reliably measured using class-wide evidence. Defendants, however, dispute Plaintiffs' position for two reasons: (1) they claim that generic bypass will affect each Plaintiff in varying degrees, and thus will result in individualized damages inquiries; and (2) they claim that, as a result of the summary judgment opinion on overall conspiracy, Plaintiffs' damages model no longer matches their theory of liability. Defendants rely upon <u>Comcast Corp. v. Behrend</u>, 133 S. Ct. 1426 (2013), for both of these arguments.

"At the class certification stage, the plaintiffs are not required to prove damages by calculating specific damages figures for each member of the class, but rather they must show that a reliable method is available to prove damages on a class-wide basis." In re Wellbutrin XL, 282 F.R.D. at 144 (citing In re Neurontin Antitrust Litig., 2011 WL 286118, at *9 (D.N.J. Jan. 25, 2011)). Courts have held that proof of aggregate damages is appropriate in class actions. In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156, 197 (1st Cir. 2009) ("The use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself"). So long as a methodology "will give a reasonable estimate of damages . . . nothing more is required." McDonough v. Toys R Us, Inc., 638 F. Supp. 2d 461, 491 (E.D. Pa. 2009).

Dr. Leitzinger applies two models to calculate aggregate damages. The first model uses estimates compiled by Defendants and Apotex around the time of the settlement agreements. Using this data, he estimates how much generic Provigil the class would have purchased if generic competition had begun in 2006, and at what prices. He then compares those numbers to the actual volume of branded Provigil purchased by the class during that same time period. The difference between the actual and but-for prices yields aggregate damages. (Leitzinger Exp. Rep., Apr. 26, 2011, ¶¶ 101-19.) His second method of calculating aggregate damages uses data on generic sales and prices obtained after generic Provigil actually entered the market in 2012 and "backcasts" this data to 2006. For example, if generic prices were 75% lower than the brand after March 2012, he assumes that same price differential would have occurred spanning back to 2006. (Leitzinger Supp. Exp. Rep., Dec. 20, 2013, ¶¶ 14-23.) Dr. Leitzinger uses these models to project damages to the class as a whole. Additionally, because he opines that each additional

competitor drives down the price of generic Provigil, Dr. Leitzinger provides separate damages estimates assuming anywhere from two to five generic competitors.  (Id. at Exs. 4, 6.)

While Plaintiffs vigorously dispute Defendants' assertion that generic bypass should be taken into consideration for the purposes of calculating damages, in an abundance of caution, Dr. Leitzinger has also provided an aggregate damages calculation that subtracts profits lost due to generic bypass on a class-wide basis.[12]  (Id. at ¶ 23, Exs. 8-9.)

Defendants dispute Plaintiffs' ability to demonstrate predominance as to damages, arguing that the Supreme Court's decision in Comcast requires Plaintiffs to be able to calculate damages for each individual class member using a class-wide methodology.  In Comcast, the district court had certified the class, but had only accepted one out of four of the plaintiffs' theories of antitrust impact as capable of class-wide proof—"the theory that Comcast engaged in anticompetitive clustering conduct, the effect of which was to deter the entry of overbuilders" in the Philadelphia area.  Comcast, 133 S. Ct. at 1431.  However, the damages model the plaintiffs' expert had used to calculate damages for the class included damages from all of the various theories of antitrust impact, including the ones not certified for class treatment.  Id.  The Supreme Court reversed class certification, finding that plaintiffs had not shown that damages were capable of measurement on a class-wide basis, as required to establish predominance.  Id. at 1433.  In short, Comcast instructs that a "plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation."  Id.

In the wake of Comcast, some defendants, including those here, have argued that plaintiffs cannot have variations in damages, and that diverse damages calculations prohibit class treatment.  This is because in Comcast, the district court held, without a challenge on appeal, that

---

[12] It is noteworthy that Defendants, who are not shy about raising Daubert challenges, have not challenged the reliability of this damages model in a Daubert motion.

28

in order to meet the predominance requirement, plaintiffs had to show "that the damages resulting from that injury were measurable 'on a class-wide basis' through use of a 'common methodology.'" Id. at 1430.  Those challenging certification have also focused on the Supreme Court's concern that "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." Id.

Circuit courts have largely rejected the interpretation urged here by Defendants—that variations in damages calculations between and among class members defeat predominance.  See Neale v. Volvo Cars of N. Am., LLC, 2015 WL 4466919, at *17 (3d Cir. July 22, 2015) ("it is a misreading of Comcast to interpret it as preclud[ing] certification under Rule 23(b)(3) in any case where the class members' damages are not susceptible to a formula for classwide measurement") (citation and quotation marks omitted); Butler v. Sears, Roebuck & Co., 727 F.3d 796, 801 (7th Cir. 2013) ("It would drive a stake through the heart of the class action device, in cases in which damages were sought . . . to require that every member of the class have identical damages"); In re Nexium Antitrust Litig., 777 F.3d 9, 18-19 (1st Cir. 2015) (limiting its interpretation of Comcast to the principle that the plaintiff's theory of impact must match his damages model); In re Deepwater Horizon, 739 F.3d 790, 817 (5th Cir. 2014) (same); In re Whirlpool Corp. Front Loading Washer Prods. Liab. Litig., 722 F.3d 838, 860 (6th Cir. 2013) (same); Leyva v. Medline Indus. Inc., 716 F.3d 510, 514 (9th Cir. 2013) (same).  Indeed, "[i]f the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification." Butler, 727 F.3d at 801.  Accordingly, Comcast has largely been limited to

its unique set of facts, and interpreted as precluding class treatment where the class-wide measure of damages does not match the theory of antitrust impact.

In light of this precedent, I disagree with Defendants' interpretation of <u>Comcast</u>, and find that variations in damages among individual class members should not defeat predominance, particularly where Plaintiffs have provided a reliable aggregate damages model.  While the parties disagree as to whether generic bypass should be accounted for in the damages calculation, I need not decide that issue at this time because Plaintiffs have provided a damages model that subtracts bypass on a class-wide basis.

Defendants separately urge that when I granted Defendants' motions for summary judgment on Plaintiffs' overall conspiracy claims, Dr. Leitzinger's damages model suffered the same defect that the Court addressed in <u>Comcast</u>, in that his damages model no longer fit Plaintiffs' theory of liability and antitrust impact.  (<u>See</u> Oral Arg. Tr., Mar. 26, 2015, pp. 70-75, 81-86; Doc. No. 793.)  Defendants argue that Dr. Leitzinger's damages model calculates aggregate damages to the entire market, which he attributes collectively to all Defendants.  To match Plaintiffs' remaining theories of liability, Defendants posit that Dr. Leitzinger needed to analyze the potential damages attributable to each of the separate bilateral agreements between Cephalon and a Generic Defendant standing on its own.  Such an analysis would allow a jury to determine, if only one or two Defendants were ultimately found liable, the amount of damages attributable to those specific parties' conduct.

Plaintiffs respond that their damages model relies upon proximate cause and indivisible injury which were foreseeable to Cephalon and the Generic Defendants based on the terms of the agreements.  According to Plaintiffs,

> If the jury finds <u>either</u> the Mylan-Cephalon <u>or</u> the Ranbaxy-Cephalon agreement unlawful, and finds that but for its unlawful agreement, Mylan or Ranbaxy would

> have launched its generic in 2006 . . . , then as Defendants themselves previously argued, the contingent launch provisions would mean that the <u>other</u> Generic Defendants would have launched in 2006 as well.

(Doc. No. 799, pp. 1-2.)  In addition, Plaintiffs have offered evidence to show that if any of the Generic Defendants would have launched generic Provigil, Cephalon would have also launched its own authorized generic product, for a total of five generics competing on the market. Therefore, Dr. Leitzinger's damages model, which aggregates total overcharges assuming anywhere from two to five Generic competitors, matches Plaintiffs' remaining theory of liability and impact.  "Launch by Mylan, Ranbaxy or both would have resulted in launch by all; validating Plaintiffs' 5-generic competitor model."  (<u>Id.</u> at p. 2.)  Further, if the jury does not find that all other Generic Defendants would have launched at-risk, Dr. Leitzinger has provided alternate calculations based upon a lesser number of competitors.  Therefore, I find that Plaintiffs' damages model matches their theory of liability and impact, and therefore, predominance has been satisfied as to damages.

### E.  <u>Superiority</u>

In establishing superiority, a plaintiff must demonstrate that resolution by class action will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results."  <u>Windsor</u>, 521 U.S. at 615.  The court must "balance in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication."  <u>In re Flonase</u>, 284 F.R.D. at 234 (quoting <u>Georgine v. Amchem Prods., Inc.</u>, 83 F.3d 610, 632 (3d Cir. 1996)).

Plaintiffs argue that where, as here, the case largely relies upon common issues and common evidence, class treatment would avoid congesting the courts with numerous suits,

prevent inconsistent results, and allow smaller class members to seek redress when they might not otherwise seek to assert their own claims. Further, when the twenty-two class members have identical claims, a class action would achieve economies of time, effort, and expense without bringing about undesirable results.

Essentially, Defendants assert that superiority has not been met because this case involves a small number of sophisticated entities who are fully capable of pursuing individual claims. They point out that the proposed class's claims are highly concentrated among the "Big Three" wholesalers, who account for 96% of the class purchases. Defendants argue these "Big Three" do not need to be a part of the class in order to vindicate their interests. While some courts have considered class members' ability to protect their own interests in analyzing superiority, it is often mentioned in passing and does not appear to be dispositive. See, e.g., Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 191 (3d Cir. 2001) (affirming denial of class certification due to failure to establish predominance and superiority, relying upon the numerous individual inquiries required, but noting in passing that some class members might have enough money at stake to bring their own claims). Finally, Defendants argue that with so few class members, joinder or intervention could be a viable alternative to class certification.

Defendants' insistence that certain class members are capable of bringing their own claims does not trump the significant benefits derived from a class action, nor have Defendants indicated that a class action would bring about undesirable results. Alternatively, Plaintiffs have convincingly argued that a class action would "achieve economies of time, effort, and expense, and promote . . . uniformity of decision" in this complex litigation that has spanned nearly a

decade.   See Windsor, 521 U.S. at 615.   Therefore, I find that Plaintiffs have established superiority by a preponderance of the evidence.

**IV.**     **CONCLUSION**

For the reasons stated herein, Plaintiffs have shown by a preponderance of the evidence that class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3). Accordingly, Plaintiffs' motion for class certification is granted.

An appropriate Order follows.