# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **KING DRUG COMPANY OF FLORENCE, INC.,** *et al.*, **on behalf of themselves and all others similarly situated,**<br><br>  **Plaintiffs,**<br><br>  **v.**<br><br>**CEPHALON, INC.,** *et al.*,<br><br>  **Defendants.** | **Civil Action No.**<br><br>**2:06-cv-01797-MSG**<br><br>---<br><br>**Judge Mitchell S. Goldberg** |

**MEMORANDUM OF LAW IN SUPPORT OF KING DRUG DIRECT PURCHASER CLASS PLAINTIFFS' MOTION TO AMEND AND CLARIFY THE COURT'S CERTIFICATION ORDERS AND TO APPROVE THE FORM AND MANNER OF NOTICE TO THE DIRECT PURCHASER LITIGATION CLASS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.   INTRODUCTION ................................................................................................ 1

    A.   Scope of Classwide Issues ......................................................................... 2

    B.   The Class Definition ................................................................................... 3

    C.   The Form and Manner of Notice ................................................................ 4

II.   ARGUMENT ....................................................................................................... 4

    A.   The Litigation Class Certification Order Should Be Amended ............................. 4

        i.   *Significant Classwide Issues Should Be Addressed in the Notice* ................... 4

        ii.   *DPCPs Have Continuously Pressed Their Patent Fraud Theory* ................... 6

        iii.   *A Possible Ambiguity in the Class Definition Should Be Clarified* ................ 11

    B.   DPCPs Proposed Notice Complies with Rule 23 ................................................. 12

        i.   *The Proposed Form of Notice Complies with Rule 23* ................................... 12

        ii.   *The Proposed Manner of Notice Complies with Rule 23* ............................... 13

        iii.   *Berdon is Qualified to Serve as Notice Administrator* ................................... 15

        iv.   *A 45-Day Opt-out Period is Adequate and Fair* ............................................ 15

III.   CONCLUSION ................................................................................................... 16

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Androgel Antitrust Litig. v. Unimed Pharms., Inc.*,
  2010 U.S. Dist. LEXIS 113593 (N.D. Ga. 2010) ................................................. 7, 8

*Ark. Carpenters Health & Welfare Fund v. Bayer AG* (*In re Ciprofloxacin Hydrochloride Antitrust Litig.*),
  604 F.3d 98 (2d Cir. 2010) ................................................................................... 6

*Ark. Carpenters Health & Welfare Fund v. Bayer AG* (*In re Ciprofloxacin Hydrochloride Antitrust Litig.*),
  544 F.3d 1323 (Fed. Cir. 2008) ............................................................................ 6

*Asahi Glass Co. v. Pentech Pharms., Inc.*,
  289 F. Supp. 2d 986 (N.D. Ill. 2003) .................................................................... 6

*FTC v. Actavis, Inc.*,
  133 S. Ct. 2223 (2013) ............................................................................. 2, 5, 6, 7, 9

*FTC v. Watson Pharms., Inc.*,
  677 F.3d 1298 (11th Cir. 2012) ............................................................................ 6

*In re DDAVP Direct Purchaser Antitrust Litig.*,
  2011 U.S. Dist. LEXIS 97487 (S.D.N.Y. 2011) ................................................... 15

*In re Janney Montgomery Scott L.L.C. Fin. Consultant Litig.*,
  2009 WL 2137224 (E.D. Pa. 2009) ...................................................................... 14

*In re Marsh & McLennan Cos.*,
  2009 U.S. Dist. LEXIS 120953 (S.D.N.Y. 2009) ................................................. 15

*In re NFL Players Concussion Injury Litig.*,
  775 F.3d 570 (3d Cir. 2014) .................................................................................. 3

*Joblove v. Barr Labs.* (*In re Tamoxifen Citrate Antitrust Litig.*),
  466 F.3d 187 (2d Cir. 2006) .................................................................................. 6

*King Drug Co. of Florence v. Cephalon, Inc.*,
  702 F. Supp. 2d 514 (E.D. Pa. 2010) .................................................................... 6

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
  339 U.S. 306 (1950) .............................................................................................. 13

*Palmer v. BRG of Georgia, Inc.*,
  498 U.S. 46, (1990) ............................................................................................... 7

*Parks v. Portnoff Law Assocs.*,
  243 F. Supp. 2d 244 (E.D. Pa. 2003) .................................................................... 14

*Phillips Petrol. Co. v. Shutts*,
    472 U.S. 797 (1985) ........................................................................................... 14

*Rochester Drug Co-Operative, Inc. v. Braintree Labs.*,
    2012 U.S. Dist. LEXIS 190011 (D. Del. 2012) ....................................................... 15

*Smith v. Prof'l Billing & Mgmt. Servs., Inc.*,
    2007 WL 4191749 (D.N.J. 2007) .......................................................................... 14

*Wilson v. United Int'l Investigative Servs. 401(k) Sav. Plan*,
    2002 WL 734339 (E.D. Pa. 2002) ......................................................................... 14

## FEDERAL STATUTES

15 U.S.C. § 1 ..................................................................................... 3, 5, 8, 9, 10
15 U.S.C. § 2 ............................................................................................. 3, 8, 9

## FEDERAL RULES

Fed. R. Civ. P. 23 ................................................................................... *passim*

## OTHER AUTHORITIES

Wright & Miller, FEDERAL PRACTICE AND PROCEDURE §23.102[3][a] (3d ed. 2010) .................... 14

MANUAL FOR COMPLEX LITIGATION (4th ed.) §21.311 at 488 ..................................... 14

## I.    INTRODUCTION

The *King Drug* Direct Purchaser Class Plaintiffs ("DPCPs") respectfully move for an order: (1) amending the Court's orders certifying the direct purchaser class for purposes of continued litigation against Mylan and Ranbaxy (the "Litigation Class") to include classwide claims they have asserted from the inception of this case, and to clarify the settlement and litigation class definitions to address a potential inadvertent ambiguity regarding the inclusion of one of the named class representatives;[1] and (2) approving a program to notify Litigation Class of Provigil of the pendency of this class action, and approving a form of notice.[2]

The DPCPs previously moved for approval of the form and manner of notice (Doc. No. 833), which this Court denied without prejudice.  (Doc. No. 841).  DPCPs have met and conferred with counsel for Mylan and Ranbaxy, and defendants have expressed no objection to the proposed manner of notice (individual notice to litigation class members via U.S. mail), to the length of the proposed opt-out period (forty-five days) or with the proposed claims administrator.  However, the parties have been unable to agree with respect to the issues and/or claims that may be subject to classwide proof.  Further, lead and liaison counsel have recently become aware that class representative SAJ, which continues to litigate on behalf of the Class, became an indirectly, wholly owned subsidiary of Walgreen Co. ("Walgreen"), and because Walgreen and other individual plaintiffs have been excluded from the Class, a potential inadvertent ambiguity may exist regarding SAJ.  Plaintiffs are therefore requesting that the Court

---

[1] Specifically, Steven L. LaFrance Holdings, Inc. and Steven L. LaFrance Pharmacy, Inc. d/b/a SAJ Distributors ("SAJ").

[2] This Court has separately entered an order governing the form and manner of notice to the settlement class, that is, the class of direct purchasers certified for purposes of the settlement with Cephalon, Teva, and Barr (the "Cephalon Defendants").  *See* Order, Case No. 06-1797 (E.D. Pa.), Doc. No. 831 (Jul. 27, 2015). Pursuant to the Court's order, that notice was distributed on or about August 17, 2015.

Unless otherwise noted, all cites to the docket refer to the *King Drug* action, Case No. 06-1797 (E.D. Pa.).

clarify the class definition to eliminate any ambiguity.

### A. Scope of Classwide Issues

During the meet and confer session, it became apparent that Mylan and Ranbaxy intend to improperly try to turn this Court's list of issues and claims in the certification order (Doc. No. 830) into a *de facto* and *sua sponte* dismissal of any claims or issues not specifically listed, including the DPCPs' legal theories that Mylan and Ranbaxy violated Sections 1 and 2 of the Sherman Act by entering into agreements with Cephalon not to compete despite learning that Cephalon's Provigil patent was obtained by fraud, and which they believed to be invalid, as evidenced by Mylan and Ranbaxy's motion for summary judgment in the underlying patent litigation.  The DPCPs have pressed and maintained these and other legal theories against Ranbaxy and Mylan throughout the litigation as have the Retailer Plaintiffs, Apotex, and the End-Payor plaintiffs.

As a result, several disputes concerning the Litigation Class certification order and the proposed class notice remain.  DPCPs propose that the notice should include the following classwide issues not currently listed in the certification order and identified below, and respectfully request that the certification order should be amended accordingly:

- DPCPs' contention that Cephalon fraudulently obtained its Provigil patent from the U.S. Patent and Trademark Office, and that knowing of the deception, Mylan and Ranbaxy nevertheless entered into agreements with Cephalon not to compete and to delay the entry of generic Provigil.  Even prior to *FTC v. Actavis*, *Inc.,* 133 S. Ct. 2223 (2013), those courts that applied the now-defunct "scope of the patent" test recognized that agreements not to compete and to delay generic entry are subject to antitrust liability if the patent was obtained via fraud or the patent suit was a sham.

DPCPs have repeatedly pressed their contention that each of the generic defendants in this case together with Cephalon can be held liable for unlawful market allocation (under Section 1) and conspiracy to monopolize (under Section 2) when the pretext for the agreements not to compete was a fraudulently obtained patent. These classwide issues are live, and the litigation class should be informed of these contentions.

- Whether damages can be calculated on a classwide basis; and

- Any defenses Defendants may assert against the class under the Rule of Reason.

Accordingly, DPCPs respectfully move the Court to amend its certification order to include these classwide questions. "[D]istrict courts always have the ability to amend and alter an order before final judgment under Rule 23(c)(1)(C)[.]"[3]

## B.  The Class Definition

DPCPs also respectfully request that the Court clarify the settlement and litigation class definitions. When DPCPs proposed definitions for the settlement and litigation classes (as amended to exclude individual litigants who had previously filed suit in the related consolidated antitrust actions), those definitions, in general terms excluded subsidiaries and affiliates of certain litigants including Walgreen that have filed individual lawsuits. In the course of preparing an opposition to Defendants' Rule 23(f) petition, lead and liaison counsel learned of an inadvertent ambiguity in both definitions that we wish to ensure does not exclude class representative SAJ, which became an indirect subsidiary of Walgreen in September 2012, six years after SAJ first initiated suit.[4] For the reasons stated below, DPCPs request that the Court

---

[3] *In re NFL Players Concussion Injury Litig.*, 775 F.3d 570, 584 (3d Cir. 2014).

[4] *See* August 24, 2015 Declaration of Scott E. Perwin ("Perwin Decl."), appended hereto as Exhibit 1.

clarify that SAJ is not excluded from the class definition.  SAJ initiated its action three years before Walgreen acquired it; has pursued this action independently of Walgreen, with its own counsel; was not part of Walgreen's prior individual settlement with Cephalon, Teva, and Barr; and is not part of the continuing litigation between Walgreen and Mylan and Ranbaxy.

### C.  The Form and Manner of Notice

Finally, because the form and manner of proposed litigation notice conforms to the requirements of Rule 23, DPCPs respectfully request that this Court approve it.

## II.    ARGUMENT

### A.  The Litigation Class Certification Order Should Be Amended

#### i.  *Significant Classwide Issues Should Be Addressed in the Notice*

The parties disagree whether including the list of issues common to the Litigation Class as stated in the Court's July 27, 2015 certification order was intended to be an exhaustive list of classwide issues.  The list currently identifies as a common issue "[w]hether Cephalon and the Generic Defendants[5] entered into pay-for-delay agreements to delay market entry of generic modafinil that violated the antitrust 'rule of reason.'"  As currently drafted, though, the list does not specifically identify DPCPs' theory based on patent fraud, although DPCPs believe that the claim would be encompassed in the certification order.  Nor does the list mention damages as a classwide issue, although the Court approved of DPCPs' plan to prove damages using an aggregate damages model (Memorandum Opinion, Doc. No. 229).

The Court previously approved of a broader, more inclusive definition of the classwide issues in the notice disseminated to the settlement class.[6]  In their original proposed notice to the

---

[5] That is to say, whether one or more generic defendants entered into a reverse payment agreement.

[6] *Compare* Order Doc. No. 830 (identifying six common issues for litigation class, four of which concerned the legality of the reverse payments); *with* Settlement Notice, Doc. No. 795-5, Apr. 17, 2015, at 6 (listing only four

Litigation Class, DPCPs had adopted the classwide issues as defined in the Court-approved settlement notice.  In an effort to narrow the areas of dispute, the DCPCs acceded to Mylan and Ranbaxy's request to use the list in the litigation order.  However, Defendants apparently contend that the list is exhaustive.  In other words, they contend that the Court, through its class certification order, has somehow *dismissed* the DPCPs' fraudulent patent theory – even though neither Ranbaxy nor Mylan ever filed a motion seeking such relief, and despite the fact that these theories have consistently been identified by the DPCPs and continue to be pressed by DPCPs and the other plaintiffs in this litigation.[7]  We do not believe the Court so intended, and therefore propose that the notice specify that the issues identified by the Court are "among" the questions common to the litigation class (i.e., the list is not exhaustive) and further that the list identifying issues for classwide treatment be revised as follows:[8]

> "The Court has identified the following as <u>among</u> the classwide issues:
>
> a.  Whether Cephalon and the Generic Defendants entered into pay-for-delay agreements to delay market entry of generic modafinil that violated the antitrust "rule of reason";
>
> b.  Whether Cephalon possessed monopoly power (and, if necessary, the definition of the relevant market);
>
> c.  Whether Cephalon made a large payment to the Generic Defendants, as described in Federal Trade Commission v. Actavis, Inc., 133 S. Ct. 2223 (2013);
>
> d.  Whether Defendants can prove any cognizable, non-pretextual, procompetitive justification for the reverse payments;
>
> e.  <u>Whether Mylan and Ranbaxy entered into agreements with Cephalon to delay the entry of generic Provigil despite learning that Cephalon fraudulently obtained its Provigil patent from the United States Patent and Trademark Office and believing that</u>

---

common issues, and classwide issue as to the legality of reverse payment agreement as "[w]hether the conduct challenged by the Class as anticompetitive in the Complaint constituted a conspiracy in restraint of trade and violated Section 1 of the Sherman Act, 15 U.S.C. § 1."); *see also* Order, Doc. No. 831, Jul. 27, 2015, at ¶ 14 (approving notice).

[7] Whether or not the DPCPs will prevail on their fraud theory, the issue applies classwide.

[8] Additions to the Court's previous list of classwide issues are underlined.

<u>the '516 patent was invalid and not enforceable;</u>

f. Whether Defendants' conduct delayed generic competition and, if so, when generics would have entered the market but for Defendants' conduct;

g. Whether impact on Direct Purchasers in the form of overcharges can be proven using proof and methodologies that are predominantly common and applicable class-wide; and

h. <u>Class-wide damages.</u>

## ii. *DPCPs Have Continuously Pressed Their Patent Fraud Theory*

The Litigation Class should be notified of DPCPs' allegations that Mylan and Ranbaxy learned of Cephalon's patent fraud and nevertheless entered into agreements with Cephalon that delayed the entry of generic Provigil. Even prior to *FTC v. Actavis*, 133 S. Ct. 2223 (2013), this Court and several Courts of Appeal recognized that agreements to delay generic entry were subject to antitrust liability. Under the (now rejected) "scope of the patent" test, a reverse payment settlement agreement based on a fraudulently obtained patent or sham suit was not immune from the antitrust laws. *See, e.g.*, *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 702 F. Supp. 2d 514, 533 (E.D. Pa. 2010) (even where "scope of the patent test framework applies[,]" sustaining claims that alleged, *inter alia*, "fraud and misrepresentations to the PTO" and "'sham litigation'"); *FTC v. Watson Pharms.*, Inc., 677 F.3d 1298, 1312 (11th Cir. 2012) (Eleventh Circuit's "scope of the patent" test did not immunize reverse payment settlement involving "sham litigation or fraud in obtaining the patent"); *Ark. Carpenters Health & Welfare Fund v. Bayer AG (In re Ciprofloxacin Hydrochloride Antitrust Litig.),* 604 F.3d 98, 533 (2d Cir. 2010) (same), citing *Joblove v. Barr Labs., Inc. (In re Tamoxifen Citrate Antitrust Litig.)*, 466 F.3d 187, 213 (2d Cir. 2006); *Ark. Carpenters Health & Welfare Fund v. Bayer AG (In re Ciprofloxacin Hydrochloride Antitrust Litig.)*, 544 F.3d 1323, 1336 (Fed. Cir. 2008) (same); *Asahi Glass Co. v. Pentech Pharms., Inc.*, 289 F. Supp. 2d 986, 992-93 (N.D. Ill. 2003) (patentee

6

enjoys no immunity if patent obtained "by fraud" or "a neutral observer would reasonably think either that the patent was almost certain to be declared invalid, or the [alleged infringers] were almost certain to be found not to have infringed it, if the suit went to judgment").

To be sure, in *Actavis*, the Supreme Court rejected the "scope of the patent" test, holding that a large reverse payment "can provide a workable surrogate for a patent's weakness[,]" 133 S. Ct. at 2236-37, and that reverse payment agreement "can sometimes violate the antitrust laws" *Id.* at 2227, 2232.  By doing so,  the Supreme Court did nothing to alter prior precedent that an agreement to divide the market knowingly based on false pretenses (such as a patent that was obtained on false pretenses and never should have issued) violates the antitrust laws regardless of whether there was a "reverse payment."  Such an agreement is no different than a garden variety unlawful market allocation agreement.  *See e.g.*, *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49-50 (1990).

Mylan and Ranbaxy entered into their respective agreements believing that Cephalon's patent was obtained by fraud and thus not a bar to competition but nevertheless agreed not to compete (relatedly, any lawsuit predicated on the patent was a sham).  This case is highly analogous to the pre-*Actavis* decision in *In re Androgel Antitrust Litig*., No. 09-md-2014-TWT, 2010 U.S. Dist. LEXIS 113593 (N.D. Ga. Sept. 16, 2010).  The generic defendants there argued that under the scope of the patent test there could be no antitrust liability even if they knowingly settled sham patent litigation by agreeing to stay off the market and delay generic entry.  The district court disagreed:

> Here, the Direct Purchasers alleged that the patent infringement litigation was a sham and that the generic Defendants knew or should have known that Solvay would not succeed on the merits. (Sec. Am. Compl. ¶ 107.) These allegations, coupled with the allegation in Count I that the generic Defendants conspired to restrain trade, are sufficient to survive the Defendants' Motions to Dismiss. Therefore, the Direct Purchasers' claim that the generic Defendants restrained or

conspired to restrain trade by entering into settlements of the sham litigation in exchange for a portion of Solvay's monopoly profits remains.

*Id.* at *8.  Here, DPCPs allege the generics knew both that the lawsuits were a sham and that the underlying patent was obtained by fraud.

Plaintiffs have advanced these theories repeatedly:

- In their Second Consolidated Amended Class Action Complaint, DPCPs specifically alleged that Mylan and Ranbaxy knew of Cephalon's deception of the PTO because they uncovered it during discovery in the patent case (Doc. No. 248 (Jan. 6, 2010) at ¶¶ 72-79), that the generics believed their defenses were so strong they moved for summary judgment as to the invalidity of Cephalon's patent (*id.* at ¶¶ 80-82), and that they knew that without the reverse payment agreements Cephalon would have lost the patent litigation (*id.* at ¶ 88), and hence, lost its monopoly over modafinil.  This was a predicate for DPCPs' Section 1 (agreements in restraint of trade) and Section 2 (conspiracy to monopolize) claims against Mylan and Ranbaxy.[9]

- In their Memorandum of Law in Opposition to Defendants' Cephalon, Teva, Barr, Ranbaxy and Mylan's Motions for Summary Judgment on Plaintiffs' Challenges to the Settlement Agreements, DPCPs argued that the fraud "supports Plaintiffs' claims against…. *all Defendants* for conspiracy to monopolize under § 2 (Count

---

[9] This Court has already held that DPCPs' alleged fraud.  *See* March 13, 2014 Summary Judgment Opinion, Doc. No. 600 at 25 ("I disagree with Cephalon that Direct Purchasers have failed to plead a Walker Process claim….the Direct Purchasers reply that they included numerous allegations regarding the infringement action against the Generic Defendants, as well as allegations that 'material information was intentionally withheld from the PTO' in connection with the prosecution of the patent. Further, the Complaint contains a Count alleging violation of section 2 of the Sherman Act, and directed only against Cephalon. A Walker Process theory fits comfortably under this Count").  Just as the allegations of fraud fit within the Section 2 count to give rise to a claim of monopolization, *inter alia*, by fraud, so too the Section 1 (agreements in restraint of trade) and Section 2 (conspiracy to monopolize) claims encompass the allegations of fraud.

VIII)" and "*all Defendants* for agreements and conspiracy in restraint of trade under § 1 (Counts I-VI)."  Doc. No. 643 (May 9, 2014) at 2-3 (emphasis added).

- At oral argument on summary judgment, the DPCPs disputed the generic defendants' position that "the Court's finding that the Cephalon patent was obtained by fraud has no implications… to this antitrust case."  Nov. 6, 2014 Tr. at 124-25.  Counsel explained that "Even under this scope of the patent test that existed prior to the Actavis decision, those courts recognized that a settlement agreement involving a patent that came by fraud should be subject to antitrust scrutiny. And, in fact, they recognize that if the patent is obtained by fraud and essentially there is no patent, the—an agreement to settle patent litigation involving a fraudulently obtained patent in which the generics agree to stay off the market is no different than a garden variety agreement among competitors not to compete."  Nov. 6, 2014 Tr. at 124-25.

- In their January 22, 2015 letter to the Court, DPCPs advised that they "assert claims that Cephalon and *each of the Generic Defendants* violated Section 1 of the Sherman Act when they settled patent litigation involving a patent procured by fraud by agreeing to delay generic competition[.]"  *See* Jan. 22, 2015 Ltr. at 4.

- At the March 23, 2015 argument on various *Daubert* motions, counsel for DPCPs reiterated that "all knew that the patent was obtained by fraud," and that "the generics who discovered the fraud" then "got together with Cephalon and exploited it."  Mar. 23, 2015 Hrg. Tr. at 77-78.

- Most recently, DPCPs' August 5, 2015 letter to the Court reiterated that DPCPs "intend to prove that both Mylan and Ranbaxy violated Section 1 by agreeing to

delay launching their generic versions of Provigil as part of settling patent litigation involving a patent they knew to have been fraudulently obtained."  See Aug. 5, 2015 Ltr. at 2.[10]

As a result, this Court has recognized that DPCPs have alleged fraud in the manner described herein:

- At the November 6, 2014 hearing, the Court itself noted that plaintiffs had contended that the fraud on the PTO was relevant to the legality of the agreements.  *See* Nov. 6, 2014 Tr. at 21-22 (asking counsel for generic defendants whether they maintained that "how the patent was procured is not a relevant consideration to the issue of whether the payments are unexplained?");

- This Court's statement in its March 13, 2014 Summary Judgment Opinion (Doc. No. 600 at 25) that "the Generic Defendants are not parties to the Walker Process claims, because they neither procured nor enforced the patent," does not mean, as Defendants would have it, that they are therefore relieved from responsibility for any aspect of the fraud.  There, the Court was discussing the extent to which the findings in the Apotex litigation could collaterally estop Cephalon, and the

---

[10] In that letter (*id.* at 3), DPCPs also reminded the Court that they had filed their Motion for Partial Summary Judgment on the Patent Issues, which was lodged against the generic defendants also, and has not yet been fully decided.  The DPCPs moved for partial summary judgment based on principles of collateral estoppel against Cephalon, as well as the traditional Rule 56 summary judgment standard against *all* defendants.  DPCPs' brief detailed why: (1) DPCPs are entitled to summary judgment that the '516 Patent is invalid; and (2) Cephalon's omissions and misrepresentations are "but for" material for purposes of inequitable conduct and *Walker Process* fraud. *Id.* at 14-24. *The generic defendants did not even file either a response* to plaintiffs' statement of facts or a counterstatement of facts or otherwise challenge the facts relating to the validity of the patent or the misstatements and omissions previously relied on by the Court in ruling on invalidity and inequitable conduct in the *Apotex* case. In its summary judgment opinion in this case, the Court addressed only the collateral estoppel issue, concluding that collateral estoppel applied only as to Cephalon. *See* Doc. No. 600 at 38.  The Court did not, however, address whether Cephalon or the Generic Defendants had raised a genuine issue of material fact under Rule 56 sufficient to survive summary judgment as to whether: (1) the '516 Patent is invalid; and (2) Cephalon's omissions and misrepresentations are "but for" material for purposes of inequitable conduct and *Walker Process* fraud (we do recognize, based on the Court's opinion, that the question of Cephalon's intent is a question for the jury). Resolution of these issues now could greatly simplify trial.

potential effect on the Generic Defendants, not the claims against the generics regarding *their agreements*.  The Court continued "[a]ccordingly, the fact that the patent was found invalid in the 2011 Apotex patent litigation should have no bearing on the proofs necessary to hold the Generic Defendants liable for antitrust violations. The Generic Defendants will still be able to argue…that they were unaware of Cephalon's alleged fraud...In short, nothing in this opinion should be interpreted to limit the ability of the Generic Defendants to put on their defense." By permitting the Generic Defendants to argue *as a defense* at trial that they *didn't* know about the alleged fraud, it is implicit in the Court's ruling that it preserved DPCPs' argument that the Generic Defendants *were aware* of the alleged fraud.

- In the Court's Jan. 28, 2015 Memorandum and Order denying defendants' motions for summary judgment, the Court specifically acknowledged DPCPs' argument that "that proof of Walker Process fraud renders the settlement agreements per se violations of the Sherman Act, and thus, evidence of fraud is sufficient to deny summary judgment." Doc. No. 736 at 18, n.12.

In sum, DPCPs' theories based on a fraudulently obtained patent continue to apply to the case against Mylan and Ranbaxy and should be identified in the notice to the Litigation Class as should the other important classwide issues such as damages.

### iii.  *A Possible Ambiguity in the Class Definition Should Be Clarified*

The current class definition contains a potential inadvertent ambiguity that we wish to ensure is not wrongly read to exclude SAJ.  Although no party has raised this issue, for the sake of clarity, DPCPs respectfully request that the Court clarify the class definition in both the

settlement and litigation classes.  SAJ is a named plaintiff and class representative in the DCPC

case.  In 2012, Walgreen acquired SAJ as a subsidiary.  Perwin Decl. at ¶ 2.  But Walgreen did

not incorporate SAJ's claims into its own case, and the SAJ and Walgreen cases have proceeded

independently of one another both before and after the acquisition.  *Id*.  Moreover, Walgreen and

SAJ have separate counsel and discrete damage models that do not account for one-another's

recovery.  *Id*.  Finally, according to Walgreen's counsel, "[w]hen the *Walgreen* Plaintiffs settled

with Teva, Barr and Cephalon in 2013, Walgreen's understanding was that it was settling only

the claims being asserted in the *Walgreen* action and not the separate claims being asserted by

SAJ in the *King Drug* action.  The notice of voluntary dismissal filed pursuant to that settlement

was a dismissal of the claims asserted in the *Walgreen* action only and not a dismissal of the

claims asserted by SAJ in the *King Drug* action."  *Id*.  Obviously, as an incorporated business,[11]

SAJ is a corporate entity that can sue and be sued in its own name, and has chosen to do just that

throughout the course of this case.

     Since Walgreen and SAJ have proceeded independently, and no prejudice would result,

DPCPs request that the Court clarify that SAJ, as a named class representative, member of both

classes, and not included in the exclusion that otherwise excludes Walgreen and its subsidiaries.

(Doc. Nos. 831, 841).

## B.  DPCPs Proposed Notice Complies with Rule 23

### i.  *The Proposed Form of Notice Complies with Rule 23*

     The DPCPs have prepared a notice (Exhibit 2 hereto) that clearly and concisely states in

plain, easily understood language the nature of the action and other elements required by Fed. R.

---

[11]  The following website lists SAJ as a corporation in good standing in Arkansas.
http://www.sos.arkansas.gov/corps/search_all.php

Civ. P. 23(c)(2)(B)(i-vii).  The notice is modeled on the form of notice that was approved by this Court for use concerning the settlement with the Cephalon, Teva, and Barr, with modifications to focus on the ongoing litigation against Ranbaxy and Mylan and to remove parts discussing the settlement.  The form of notice satisfies the requirements of due process and Fed. R. Civ. P. 23(c)(2)(B).  Pursuant to Fed. R. Civ. P. 23(c)(2)(B), "[t]he notice must clearly and concisely state in plain, easily understood language:

    i.    the nature of the action;

    ii.    the definition of the class certified;

    iii.    the class claims, issues, or defenses;

    iv.    that a class member may enter an appearance through an attorney if the member so desires;

    v.    that the court will exclude from the class any member who requests exclusion;

    vi.    the time and manner for requesting exclusion; and

    vii.    the binding effect of a class judgment on members under Rule 23(c)(3).

The proposed notice is designed to alert class members to the litigation by using a bold headline.  This headline will enable class members to quickly determine if they are potentially affected by the litigation.  Plain language text provides important information regarding the subject of the litigation, the class definition, and the legal rights available to class members, including instructions on how a class member may exclude itself from the litigation.  In addition, the proposed notice prominently features class counsel's contact information, which class members can utilize to obtain other information, if desired.

### ii.  *The Proposed Manner of Notice Complies with Rule 23*

Pursuant to Fed. R. Civ. P. 23(c)(2)(B), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  The best practicable notice is one that can be

"reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950).

Based on Cephalon's actual sales data for Provigil produced in this action (reviewed and summarized by the DPCPs' economic expert, Jeffrey J. Leitzinger, Ph.D.), the DPCPs have identified the members of the class of direct purchasers of Provigil, and have identified the mailing address of each class member. *See* Memorandum Opinion, Doc. No. 829, at 8 n.6 (Jul. 27, 2015) ("Plaintiffs note that they have identified all potential class members using Cephalon's records."). Counsel for defendants conceded as much at the class certification hearing. *See* Class Certification Hrg. Tr. (Mar. 26, 2015), at 58 ("We know who they [the class members] are. We have their addresses.").

Under these circumstances, the best method of notice is individual notice. *See* MANUAL FOR COMPLEX LITIGATION (4th ed.) §21.311 at 488 ("Rule 23(c)(2)(B) requires that individual notice in 23(b)(3) actions be given to class members who can be identified through reasonable effort"). Accordingly, federal courts routinely order individual notice by first class mail.[12]

The DPCPs propose mailing the notice concerning the litigation class on or before September 1, 2015 so that the Class can be notified of the certification of this suit in advance of trial.

---

[12] *See* 23 Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE §23.102[3][a] (3d ed. 2010) ("Courts usually order the class proponent to give notice of the class action by first-class mail to all individual class members who can be identified with reasonable effort"); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) (finding that sending a descriptive notice via first class mail to all class members satisfies due process); *Smith v. Prof'l Billing & Mgmt. Servs., Inc.*, 2007 WL 4191749, at *5  (D.N.J. Nov. 21, 2007) ("first-class mail . . . is unquestionably the best notice practicable under the circumstances"); *Parks v. Portnoff Law Assoc.*, 243 F. Supp. 2d 244, 250 (E.D. Pa. 2003) ("notices . . . sent via first class mail to the last known address in defendant's records of the 2,391 potential class members . . . was a reasonable effort as well as the most efficient and effective means for reaching individual members of the class"); *In re Janney Montgomery Scott LLC Fin. Consultant Litig.*, 2009 WL 2137224, at *7 (E.D. Pa. July 16, 2009) (notice by first-class mail); *Wilson v. United Int'l Investigative Servs. 401(k) Sav. Plan*, 2002 WL 734339, at *8 (E.D. Pa. Apr. 23, 2002) (same).

### iii.   *Berdon is Qualified to Serve as Notice Administrator*

Berdon Claims Administration LLC ("Berdon") is in the business of carrying out large

public notice or payment projects on behalf of businesses and governmental agencies.  This

Court appointed Berdon as the notice administrator for the settlement class (Order, Doc. No.831

¶¶ 16).  Berdon has also been appointed as class notice and/or claims administrator in many

pharmaceutical products antitrust class actions, including the *Neurontin*, *Cardizem CD*,

*Nifedipine*, and *Relafen* antitrust cases.[13]  The classes in those prior cases are very similar to the

class certified here, and Berdon successfully executed the court-approved notice program in

those cases without incident.  Through these and other matters, Berdon has developed and

demonstrated the expertise to effectively execute class notice programs in pharmaceutical

products antitrust class actions.  Accordingly, Berdon should be appointed Notice Administrator.

### iv.   *A 45-Day Opt-out Period is Adequate and Fair*

The notice allows for a period of 45 days for class members to exclude themselves from

the class.  Forty-five days is more than sufficient for class members to decide whether to opt out,

particularly because class members here are not consumers but businesses.  *See Rochester Drug

Co-Operative, Inc. v. Braintree Labs., Inc*., No. 07-cv-142-SLR, 2012 U.S. Dist. LEXIS 190011,

at *9 (D. Del. Feb. 6, 2012) (45-day period approved in delayed generic competition case

brought by direct purchasers); *In re DDAVP Direct Purchaser Antitrust Litig*., No. 7:05-cv-

02237-CS, 2011 U.S. Dist. LEXIS 97487, *10 (S.D.N.Y. Aug. 16, 2011) (30-day period

approved in delayed generic competition case brought by direct purchasers). *See also In re

Marsh & McLennan Cos., Inc. Sec. Litig*., No. 04-8144, 2009 U.S. Dist. LEXIS 120953, at *40

(S.D.N.Y. Dec. 23, 2009) (approving 30-day notice period to class in complex securities

---

[13] *See* Berdon Claims Administration, LLC, http://www.berdonclaims.com/cases/Default.aspx.

fraud class action).  The proposed notice directs class members that wish to exclude themselves from the class to submit their exclusion request to class counsel.

This Court has already provided class members with 45 days to exclude themselves from the settlement class, Order, Doc. No. 831 at ¶¶ 14-15 (Jul. 27, 2015), and providing for the same amount of time makes sense for the litigation class as well.

III.   **CONCLUSION**

For the reasons stated, direct purchaser class plaintiffs respectfully request that the Court amend the list of issues to be tried on a classwide basis, clarify that SAJ is not excluded from the direct purchaser class, and to approve the form and manner of notice.  A proposed Order is appended as Exhibit 3.

Dated:  August 24, 2015

Respectfully submitted,

By:  */s/* Bruce E. Gerstein

GARWIN GERSTEIN & FISHER LLP
Bruce E. Gerstein
Joseph Opper
Kimberly Hennings
Dan Litvin
Wall Street Plaza
88 Pine Street, 10th Floor
New York, NY 10005
Tel:  (212) 398-0055
Fax: (212) 764-6620

*Lead Counsel for Plaintiffs in the King Drug
Direct  Purchaser Action*

BERGER & MONTAGUE, P.C.
David F. Sorensen
Daniel C. Simons
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604

*Liaison Counsel and Member of the
Executive Committee for Plaintiffs in the King
Drug Direct Purchaser Action*

ODOM & DES ROCHES, LLP
Stuart E. Des Roches
650 Poydras Street, Suite 2020
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078

*Executive Committee for Plaintiffs in
the King Drug Direct Purchaser Action*

SMITH SEGURA & RAPHAEL, LLP
David P. Smith
Susan C. Segura
3600 Jackson Street, Suite 111
Alexandria, LA 71303
Tel: (318) 445-4480
Fax: (318) 487-1741

*Executive Committee for Plaintiffs
in the King Drug Direct Purchaser Action*

HEIM PAYNE & CHORUSH, LLP
Russell Chorush
Chase Tower
600 Travis, Suite 6710
Houston, TX 77002
Tel: (713) 221-2000

*Counsel for Plaintiffs in the King
Drug Direct Purchaser Class Action*

NASTLAW, P.C.
Dianne M. Nast
Erin C. Burns
1101 Market St. – Suite 2801
Philadelphia, PA 19107
(215) 923-9300

*Counsel for SAJ Distributors, Inc., and
Stephen L. LaFrance Holdings, Inc.*

GRANT & EISENHOFER, P.A.
Linda P. Nussbaum
485 Lexington Ave.
New York, NY 10017
Tel: (646) 722-8500
Fax: (646) 722-8501

*Counsel for Plaintiffs Meijer, Inc. and Meijer
Distribution, Inc. and Executive Committee for
Plaintiffs in the King Drug
Direct Purchaser Action*

FARUQI & FARUQI LLP
Peter Kohn
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
Tel: (215) 277-5770
Fax: (215) 277-5771

*Counsel for Rochester Drug Co-Operative,
Inc.*

**CERTIFICATE OF SERVICE**

I, Bruce E. Gerstein, hereby certify that a copy of the foregoing documents were served via email on all parties on August 24, 2015.

_/s/ Bruce E. Gerstein_
Bruce E. Gerstein