**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

KING DRUG COMPANY OF FLORENCE, INC., :     CIVIL ACTION
et al.,                                        :
                 Plaintiffs,      :
                                        :
              v.                       :     No. 2:06-cv-1797
                                        :
CEPHALON, INC., et al.,            :
                       Defendants.      :
_____:

**Goldberg, J.**                                                **August 28, 2017**

## <u>MEMORANDUM OPINION</u>

This case involves class action antitrust allegations stemming from several reverse payment patent settlements under the Hatch-Waxman Act, now commonly referred to as an <u>Actavis</u> claim. On remand from the United States Court of Appeals for the Third Circuit, I again address the numerosity analysis under Federal Rule of Civil Procedure 23(a)(1).

Direct Purchaser Class Plaintiffs initially brought this antitrust lawsuit against the manufacturer of Provigil, Cephalon, Inc., as well as four generic pharmaceutical companies (collectively "Generic Defendants").[1] The four Hatch-Waxman reverse-payment settlements at issue, executed in 2005 and 2006, were between Cephalon and each of the Generic Defendants, and were alleged to be anticompetitive for delaying the market entry of generic Provigil.

---

[1] The Generic Defendants are Teva Pharmaceutical Industries, Ltd. and Teva Pharmaceuticals USA, Inc. ("Teva"); Ranbaxy Laboratories, Ltd. and Ranbaxy Pharmaceuticals, Inc. ("Ranbaxy"); Mylan Pharmaceuticals, Inc. and Mylan Laboratories, Inc. ("Mylan"), and Barr Laboratories, Inc. ("Barr").

Direct Purchasers settled with Cephalon, Teva and Barr on April 17, 2015 and Mylan on January 17, 2017. (<u>See</u> Pls.' Mot. for Class Cert. p. 1, n.1) In connection with the settlement reached with Mylan, Direct Purchasers have also moved for certification of a settlement class. Mylan does not oppose that motion and it will be resolved in a forthcoming order.

Direct Purchaser Class Plaintiffs have filed a supplemental motion for class certification. The prospective class again includes drug wholesalers that purchased the brand-name drug, Provigil, directly from Cephalon, Inc. at any time between June 24, 2006 and August 31, 2012.

This motion follows the Third Circuit's Opinion vacating my initial grant of class certification. See In re Modafinil Antitrust Litig., 837 F.3d 238 (3d Cir. 2016). Noting that it had "not had occasion to list relevant factors that are appropriate for district court judges to consider when determining whether joinder would be impracticable," the Third Circuit provided "a framework for district courts to apply when conducting their numerosity analyses." Id. at 252–53, 242.

Based on the scope of the remand, the only question before me is whether the proposed class satisfies the numerosity requirement under Federal Rule of Civil Procedure 23(a)(1). For the reasons that follow, and applying the framework set out by the Third Circuit, I conclude that the numerosity requirement is not satisfied and, as a result, Direct Purchasers' supplemental motion for class certification will be denied.

## I.     PROCEDURAL HISTORY

On July 27, 2015, I granted Direct Purchasers' initial motion for class certification. Subsequently, Mylan and Ranbaxy sought and obtained appellate review of that decision pursuant to Federal Rule of Civil Procedure 23(f).

On September 13, 2016, the United States Court of Appeals for the Third Circuit issued its opinion vacating my July 27, 2015 class certification ruling and remanding for further consideration of whether joinder of all class members is impracticable – i.e. the numerosity requirement under Federal Rule of Civil Procedure 23(a)(1).[2]

_____

[2] The Third Circuit affirmed my ruling on the predominance prong – the only other issue considered on appeal.

Direct Purchasers have filed a supplemental motion for certification of a litigation class, proposing the same class definition as was proposed in their initial motion. They continue to seek certification of the following class:

> All persons or entities in the United States and its territories and/or their assignees (partial or otherwise) who purchased Provigil in any form directly from Cephalon at any time during the period from June 24, 2006 through August 31, 2012 (the "Class").
>
> Excluded from the Class are Defendants, and their officers, directors, management, employees, subsidiaries, or affiliates, and all federal governmental entities.
>
> Also excluded from the Class are Rite Aid Corporation, Rite Aid HDQTRS. Corp., JCG (PJC) USA, LLC, Eckerd Corporation, Maxi Drug, Inc. d/b/a Brooks Pharmacy, CVS Caremark Corporation, Walgreen Co., The Kroger Co., Safeway Inc., American Sales Co. Inc., HEB Grocery Company, LP, Supervalu, Inc., and Giant Eagle, Inc. and their officers, directors, management, employees, subsidiaries, or affiliates in their own right and as assignees from putative Direct Purchaser Class members ("Retailer Plaintiffs"). For purposes of clarity, Steven L. LaFrance Holdings, Inc. and Steven L. LaFrance Pharmacy, Inc. d/b/a SAJ Distributors ("SAJ") is not a Retailer Plaintiff and is a member of the Class; while Retailer Plaintiff Walgreen Co. acquired SAJ in 2012, SAJ's case and claim have proceeded independently of Walgreen Co.

### a. Prior Numerosity Ruling

I previously determined that Direct Purchasers class members were so numerous as to make joinder impracticable. Regarding the number of members in the proposed class, I rejected Defendants' arguments that certain class members should be excluded because they (1) were proceeding by way of partial assignment, (2) ceased operations prior to generic entry and/or (3) made all purchases of branded Provigil after generic Provigil had already entered the market. Thus, I determined that the proposed class contained two-twenty members. See King Drug Co. of Florence v. Cephalon, Inc., 309 F.R.D. 195, 204–06 (E.D. Pa. 2015).

Regarding the impracticability of joinder, I examined the following five factors: "(1) judicial economy, (2) geographic dispersion, (3) financial resources of class members, (4) the claimants' ability to institute individual suits, and (5) requests for injunctive relief that could affect future class members." King Drug, 309 F.R.D. at 203-04 (citing In re Wellbutrin XL Antitrust Litig., 2011 WL 3563385, at *3 (E.D. Pa. Aug. 11, 2011)). In applying those factors, I stated:

> Considering the extensive history of this litigation and the exhaustive discovery that has been conducted, I conclude that judicial economy is best served by trying this case as a class action. Joinder of the absent class members would likely require additional rounds of discovery, which would only further delay a trial date. Further, if cases were brought within other jurisdictions, additional discovery is certainly a possibility, and separate trials could result in inconsistent verdicts. . . .

> Plaintiffs have also demonstrated that the class members are geographically diverse, which has the potential to create problems if all class members were to join the litigation. It is undisputed that the prospective class members are spread out over thirteen states and Puerto Rico. The considerable geographic dispersion of the parties would certainly present challenges to Plaintiffs in attempting to coordinate the litigation if all class members were joined, particularly if additional discovery was required. . . . Therefore, geographic dispersion weighs in favor of a finding that joinder is impracticable.

> Two factors that may weigh against Plaintiffs are the financial resources of the class members and the parties' abilities to bring individual suits. Plaintiffs do not dispute that the prospective class members are all sophisticated corporations that have experience conducting litigation. Additionally, while Plaintiffs argue that the ongoing business relationships between the class members and Defendants warrants certifying a class due to fear of retaliation, there is no evidence to support Plaintiffs' theory.

> Plaintiffs do convincingly respond, however, that some of the prospective class members' claims are relatively small, such that there may not be an economic incentive to engage in expensive antitrust litigation. For example, using data derived from Defendants' economic expert, Dr. Ordover, six class members may

have claims below $1 million. (See Ordover Supp. Exp. Rep., Ex. 1; Pls.' Reply, p. 9 n. 36.) These prospective class members likely do not have the same incentive to engage in costly antitrust litigation on their own.

The complexity and extensive history of this case, the expansive discovery conducted, and the geographic dispersion of the parties all favor class treatment. While some factors weigh in Defendants' favor, I find those factors less compelling. Accordingly, Plaintiffs have demonstrated by a preponderance of the evidence that the parties are sufficiently numerous so as to make joinder impracticable.

Id. at 206–07.

### b. United States Court of Appeals for the Third Circuit's Opinion

The Third Circuit concluded that I abused my discretion for two primary reasons: in certifying the class, my numerosity analysis (1) "improperly emphasiz[ed] the late stage of the proceeding," and (2) I did not consider the "ability of individual class members to pursue their cases through the use of joinder" as opposed to individual cases. In re Modafinil Antitrust Litig., 837 F.3d at 249.

Regarding the size of the class, the Third Circuit held that Defendants had waived their arguments regarding the propriety of members proceeding by way of assignment.[3] Even though the argument was waived, the Third Circuit nonetheless found it "appropriate" to consider the partial assignment issue because they were remanding on the numerosity issue. Id. at 251. The Third Circuit agreed with my conclusion that "unless there is evidence that the class plaintiffs are seeking to artificially inflate the number of claimants, partial assignees may properly be treated as class members." Id. at 252. As such, for purposes of conducting the impracticability analysis, the Third Circuit assumed, as I found, that the class consisted of twenty-two members. Id.

---

[3] The court also noted that Direct Purchasers argued, for the first time on appeal, that three additional assignees of claims had recently been discovered and that the class actually consists of twenty-five members. The Third Circuit directed that, on remand, I consider whether the three new assignees should be included as class members. This issue is discussed below.

In light of the relatively small class, the Third Circuit noted that "inquiry into impracticability should be particularly rigorous when the putative class consists of fewer than forty members." <u>Id.</u> at 250. The Third Circuit then articulated, for the first time, the following non-exhaustive list of factors relevant to the impracticability analysis: "judicial economy, the claimants' ability and motivation to litigate as joined plaintiffs, the financial resources of class members, the geographic dispersion of class members, the ability to identify future claimants, and whether the claims are for injunctive relief or for damages." <u>Id.</u> at 253. The Third Circuit stressed that judicial economy and ability to litigate as joined parties are of primary importance. <u>Id.</u> The court emphasized that it is improper to consider the possibility that plaintiffs may bring individual lawsuits as the relevant choice is a binary one: between a class and <u>joinder of all interested parties</u>. <u>Id.</u>

### i. Judicial Economy

Applying this new impracticability standard, the Third Circuit concluded that my judicial economy analysis was incorrect because it placed "great weight" on the late stage of the proceedings. The Court held that "the late stage of litigation" – including sunk costs, the need for additional discovery and the risk of postponing trial – "is not by itself an appropriate consideration to take into account as part of a numerosity analysis." <u>Id.</u> at 254. The court reasoned that if the late stage of litigation were an appropriate consideration it "would place a thumb on the scale in favor of a numerosity finding for no reason other than the fact that the complex nature of a case resulted in the class certification decision being deferred for years." <u>Id.</u> at 255. The Third Circuit instructed that the judicial economy analysis is primarily concerned with "docket control, taking into account practicalities as simple as that of every attorney making an appearance on the record." <u>Id.</u> at 256-257.

### ii.  Ability and Motivation to be Joined as Plaintiffs

The Third Circuit also concluded that I did not fully explore the ability and motivation of class members to be joined as plaintiffs because I improperly focused on whether class members could have brought their own, individual suits. The court instructed that this factor "primarily involves an examination of the stakes at issue for the individual claims and the complexity of the litigation, which will typically correlate with the costs of pursuing these claims." Id. at 257.

The Third Circuit then recounted the record regarding the ability and motivation of the twenty-two putative class members to litigate as joined parties. The court first stressed that "the class members, based on the record before us, appear likely to have the ability and incentive to bring suit as joined parties, thus preventing the alleged wrongdoers from escaping liability." Id. at 258 (emphasis added). To amplify this point, the Court noted that three class members have claims estimated at over $1 billion and that those claims make up over 97% of the total value of the class claims. The court further stated that while this factor could nonetheless weigh in favor of class certification if the other class members had very small claims, that was "simply not the case." Id. The court reasoned that thirteen of the remaining class members had claims in excess of $1 million, the figure that the parties "seem to agree is the appropriate figure at which point bringing one's own suit become economical" and there was no showing that it would in fact be uneconomical for the other six class members to be joined as parties. Id. at 258-259.

After concluding that remand was warranted for further consideration of the numerosity requirement, the Third Circuit stated "the judges in the majority have never seen a class action where three class members, each with billions of dollars at stake and close to 100% of the total value of class claims between them, have been allowed to sit on the sidelines as unnamed class members." Id. at 259.

The class certification issue is before me via remand and consideration of whether the putative class members have "the ability and incentive to bring suit as joined parties," id. at 258. However, the conclusions by the Third Circuit set forth above, leave little room for "consideration" and create an uphill battle for the Direct Purchasers to now convince me that certification is appropriate.

## II.  **LEGAL STANDARD**

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Wal-Mart Stores v. Dukes, 131 S. Ct. 2541, 2550 (2011) (quoting Califano v. Yamasaki, 442 U.S. 682, 700-01 (1979)) (quotation marks omitted). In order to certify a class action, the plaintiffs bear the burden of proving by a preponderance of the evidence that the putative class satisfies all of the prerequisites identified in Federal Rule of Civil Procedure 23(a) and one of the subcategories of Rule 23(b). Fed. R. Civ. P. 23; In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 320 (3d Cir. 2008).

"[P]roper analysis under Rule 23 requires rigorous consideration of all the evidence and arguments offered by the parties." Hydrogen Peroxide, 552 F.3d at 321. "[T]he court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action." Id. at 307.

Subsection (a) of Rule 23 contains four prerequisites for any class action:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In light of the Third Circuit's limited remand, the only perquisite at issue here is the numerosity requirement set forth in Rule 23(a)(1).

The numerosity prerequisite requires a plaintiff to show by a preponderance of the evidence that the proposed class is so numerous that joinder of all absent class members would be impracticable. In re Wellbutrin XL Antitrust Litig., 2011 WL 3563385, at *2-3. This analysis largely "depends on the circumstances surrounding the case and not merely on the number of class members." Jackson v. SEPTA, 260 F.R.D. 168, 185-86 (E.D. Pa. 2009). While there is no precise number required to satisfy the numerosity requirement, the United States Court of Appeals for the Third Circuit has made the following observations:

> While there are exceptions, numbers under twenty-one have generally been held to be too few. Numbers between twenty-one and forty have evoked mixed responses and again, while there are exceptions, numbers in excess of forty, particularly those exceeding one hundred or one thousand have sustained the requirement.

Weiss v. York Hosp., 745 F.2d 786, 808 n.35 (3d Cir. 1984) (citing 3B J. Moore, Moore's Federal Practice ¶ 23.05[1], at 23-150 (2d ed. 1982)).

In addition to the number of class members, the Third Circuit articulated the other factors relevant to determining the impracticability of joining all class members in its opinion vacating my prior ruling certifying the Direct Purchaser class. See In re Modafinil Antitrust Litig., 837 F.3d at 250. Those factors and their application are set forth above.

### III. ANALYSIS

In response to the Third Circuit's opinion, the Direct Purchasers have offered additional arguments and some new evidence in support of their position that the numerosity requirement is

satisfied.[4] Ranbaxy vigorously disputes Direct Purchasers' contentions and relies heavily on what it contends is a clear message from the Third Circuit that certification of the Direct Purchaser class is inappropriate.

### a. Appropriate Number of Class Members

The number of class members is the starting point of the numerosity analysis. In re Modafinil Antitrust Litig., 837 F.3d at 250. As noted above, during the original class certification proceedings, I found that the class consisted of twenty-two members. See King Drug, 309 F.R.D. at 206. On appeal, Direct Purchasers stated that they had identified three additional class members, raising the size of the proposed class to twenty-five.

Direct Purchasers explain that Wal-Mart Stores, Inc., Publix Super Markets, Inc., and Bi-Lo Holdings, LLC were identified as additional class members during the claims administration process that followed the initial certification of the class. Direct Purchasers urge that these three entities are properly considered as class members by virtue of their partial assignments and the fact that there is no evidence that Direct Purchasers are trying to artificially inflate the number of claimants.

In response, Ranbaxy contends that Bi-Lo's assignment is limited to the right to submit a claim for a share of the proceeds from the settlement with the Cephalon Defendants (i.e.

---

[4] In support of their supplemental motion for class certification, Direct Purchasers rely on the record from the prior class certification proceedings and have supplemented that record with declarations from various class members and an expert report from Professor William B. Rubenstein. As such, I incorporate the discussion of the record from my previous class certification ruling as it pertains to the numerosity requirement. Additionally, I have considered all new evidence presented by Direct Purchasers – namely the affidavits from class members and the Rubenstein report – and note its impact on my analysis where relevant.

Cephalon, Teva and Barr) and the assignment does not mention Ranbaxy let alone a right to pursue a claim against Ranbaxy as part of the litigation class.[5]

Based on my review, the Wal-Mart and Publix assignments seem to broadly assign the rights to all causes of action against Cephalon, Barr, Teva, Mylan and Ranbaxy relating to any purchases of Provigil the assigning entities made during the relevant time period. (See Pls.' Mot., Gerstein Dec., Exs. 8, 10.)

The Bi-Lo assignment (via Cardinal Health), however, could be considered somewhat ambiguous. (See id. at Ex. 9.) In a section entitled "Recitals," the assignment states:

> Bi-Lo wishes to submit a claim for recovery of funds from the settlement of the matter of *King Drug. Co. of Florence, Inc.*, E.D. Pa. Case No. 06-1797, with the Cephalon Defendants, as defined in the Settlement Agreement, based upon Bi-Lo's purchases of Provigil from Cardinal Health during the relevant time period.

(Id. at ¶ A.) But, consistent with Ranbaxy's position, this language suggests that Bi-Lo and Cardinal Health only contemplated an assignment of the right to seek proceeds from the settlement with Cephalon, Teva and Barr. However, under the section entitled "agreement," the assignment more broadly states:

> Cardinal Health hereby conveys, assigns and transfers to Bi-Lo all rights, title and interest in and to all causes of action it may have against Defendants under the laws of the United States or of any State arising out of or relating to Cardinal Health's purchase of Provigil and/or its generic equivalent that was subsequently resold to Bi-Lo during the period from June 24, 2006 to August 31, 2012. This assignment includes Cardinal Health's status as a direct purchaser of all Provigil described in the preceding sentence.

---

[5] Without any real discussion, Ranbaxy notes that if the size of class members is assessed as of the "onset of litigation," the class is even smaller because "all of the assignments were made in the wake of the Direct Purchasers' April 2015 settlement with Teva/Cephalon/Barr." (See Def.'s Resp., p. 4 n.1.) As Ranbaxy did not offer any explanation or elaboration of its argument, I am unable to resolve this issue.

(Id. at ¶ 1.) Consistent with Direct Purchasers' position, this language could be read broadly as assigning all rights Cardinal Health had to pursue any claim relating to its purchase of Provigil. The use of "Defendants" in the foregoing passage is ambiguous because it is not defined elsewhere in the agreement but it could be read to include Ranbaxy as well as Cephalon, Teva and Barr.

All of that aside, at this stage, I find it unnecessary to determine whether Bi-Lo is properly considered a member of the proposed class by virtue of its assignment with Cardinal Health because the difference between twenty-four or twenty-five class members does not impact the rest of my numerosity analysis. Regardless of whether the class consists of twenty-four or twenty-five members, "inquiry into impracticability should be particularly rigorous when the putative class consists of fewer than forty members." In re Modafinil Antitrust Litig., 837 F.3d at 250.

### b. Impracticability of Joinder

As noted above, the Third Circuit identified the following factors as relevant to, but not exhaustive of the required impracticability of joinder analysis: "judicial economy, the claimants' ability and motivation to litigate as joined plaintiffs, the financial resources of class members, the geographic dispersion of class members, the ability to identify future claimants, and whether the claims are for injunctive relief or for damages." Id. at 253.

### i. Judicial Economy

Judicial economy looks to the "administrative burden" of multiple or aggregate claims and takes into account "any efficiency considerations regarding the joinder of all interested parties that the district court deems relevant, including the number of parties and the nature of the action." Id. at 254. The judicial economy analysis must "focus on whether the class action

mechanism is substantially more efficient than joinder of all parties." Id. This analysis is primarily concerned with "docket control, taking into account practicalities as simple as that of every attorney making an appearance on the record." Id. at 256-257.

Direct Purchasers contend that judicial economy concerns favor class certification and stress that joinder will render what was an already complex case unmanageable. According to Direct Purchasers, joinder would mean twenty-five individual plaintiffs represented by twenty-five lawyers, greatly expanded discovery – with document production and depositions from each class member, more depositions potentially with each joined plaintiff attending and participating in questioning, a multiplication of experts, additional diverse positions regarding motions practice, and an extraordinarily difficult to manage trial. In support, Direct Purchasers offer an affidavit from Professor William B. Rubenstein, author of the Newburg on Class Actions treatise. Therein, Professor Rubenstein discusses what he contends are the administrative burdens that could arise if litigation was to proceed by joinder in this case.[6]

Ranbaxy convincingly responds that throughout this case the various plaintiff groups have engaged in a multitude of cost and resource sharing tactics. For example, Ranbaxy notes that the nine opt-out retailer plaintiffs – who are direct competitors – have filed joint motions, collectively retained experts and adopted the filings of other plaintiff groups. According to Ranbaxy, this cooperation demonstrates that adding litigants will not create the multiplication Direct Purchasers fear joinder will create.

Although Direct Purchasers' concerns about the multiplication of discovery, depositions, experts and motion practice are not immaterial, they are less compelling when viewed in the

---

[6] Consistent with my ruling on Ranbaxy's Daubert challenge, I have considered Professor Rubenstein's discussion of the difficulties that he claims are inherent in application of the joinder model but have disregarded his opinions as to the weight that should be afforded these considerations as well as his ultimate conclusion that Rule 23(a)(1) is satisfied here.

context of the relatively small size of the putative class. Furthermore, I agree with Ranbaxy that cost and resource sharing mechanisms exist and could address the judicial economy concerns identified by Professor Rubenstein.

For example, to date, plaintiffs in this case as well as various related cases have jointly retained experts and nothing in the record suggests that continuing to do so would not be feasible if the case was to proceed via joinder. See In re Modafinil Antitrust Litig., 837 F.3d 238, 256 ("in addition, as a class, Plaintiffs have been using the same experts. It is not clear that there would be a need for that to change merely because Plaintiffs would be joined as individual parties instead of moving forward as a class.")

Also, in proceeding by joinder, Direct Purchasers could join in motions or responses to motions filed by Ranbaxy. Based on my "understanding of how the case has proceeded to date," In re Modafinil Antitrust Litigation, 837 F.3d at 257, use of these mechanisms is both feasible and likely. In fact, doing so has been the norm in this case as well as the other various related cases. Concerns about the multiplication of discovery could be addressed through careful implementation of Federal Rule of Civil Procedure 26(b)(2)(C)(i). See id. (court must limit discovery sought where it is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive.")

Lastly, while I originally concluded that judicial economy concerns could account for the amount of discovery already conducted and a delay in the trial date, those considerations are no longer applicable. See In re Modafinil Antitrust Litig., 837 F.3d at 256 ("when considering the judicial economy factor of the numerosity analysis, the District Court should not take into account the sunk costs of the litigation or the need to further delay trial were the class not to be certified.") In short, given the Third Circuit's directive, I am constrained to exclude from my

analysis consideration of "sunk costs" or how denying the class certification motion at this stage of the litigation may further delay this case.

For all of the reasons set forth above, I conclude that judicial economy concerns weigh against certifying the Direct Purchaser litigation class.

### ii. Claimants' Ability and Motivation to Litigate as Joined Plaintiffs

As noted above, whether the class members have the ability and motivation to litigate as joined plaintiffs "primarily involves an examination of the stakes at issue for the individual claims and the complexity of the litigation, which will typically correlate with the costs of pursuing these claims." In re Modafinil Antitrust Litig., 837 F.3d at 257. Throughout its opinion, the Third circuit stressed that this factor was one of the "most important numerosity factors. . . ." Id. at 259.

Direct Purchasers contend that the class members lack both the ability and motivation to litigate as joined parties. Noting that the class members are all wholesalers and horizontal competitors, Direct Purchasers contend that class members would have wary, arms-length interactions and any joint action would be complicated, and, possibly, made illegal by the antitrust laws. In support, Direct Purchasers cite to declarations of representatives from putative class members indicating that they are uncertain whether joint action would be feasible and that they had not evaluated whether they would bring suit absent certification of the class. (Pls.' Mot., Ex. 11, Perrault Decl. ¶ 5; Ex. 12, Rausch Dec. ¶¶ 3, 5; Ex. 13, Hanks Decl. ¶ 5.) Relatedly, Direct Purchasers contend that ethical rules may prevent attorneys from jointly representing multiple wholesalers if litigation proceeds via joinder.

According to Direct Purchasers, at the onset of litigation, the likely expenses would also have exceeded reasonable expectations of recovery for a "substantial" number of class members

and, as such, those class members would have "negative value" claims.[7] Direct Purchasers also urge that, at the time litigation was commenced, damages were uncertain and, in fact, later discovery revealed that potential damages only began to accrue several months after the cases were filed. Direct Purchasers claim that many of the individual claims of class members are lower than the $5.3 million in litigation costs expected to be incurred through trial.

Direct Purchasers point out that a joint litigation agreement, even if feasible, would not solve the foregoing "negative value" issues. According to Direct Purchasers, a small wholesaler would be unlikely to join the law suit absent some assurance from the larger claimants that they would stay joined throughout the litigation, would not settle early and would agree to fund litigation costs pro rata regardless of outcome. Direct Purchasers contend that a larger claimant would have no incentive to enter into such an arrangement with its competitors.

Lastly, Direct Purchasers urge that fear of retaliation also reduces class members' motivation to litigate via joinder. In support, Direct Purchasers offer the declarations of putative class members asserting that they have concerns that litigation through joinder would negatively impact their relationships with Ranbaxy – one of their suppliers. Recognizing that there is no real evidence to support the fear of retaliation, Direct Purchasers admit that these concerns are inchoate.

Ranbaxy responds that the Third Circuit indicated that the class members likely have the ability and motivation to litigate as joined parties. Ranbaxy urges that nothing has changed about the ability and motivation of the class since the appeal was submitted.

---

[7] A negative value claim is a "claim[ ] that could not be brought on an individual basis because the transaction costs of bringing an individual action exceed the potential relief." In re Modafinil Antitrust Litig., 837 F.3d at 257 n.21 (quoting In re Baby Prods. Antitrust Litig., 708 F.3d 163, 179 (3d Cir. 2013)).

Ranbaxy disputes Direct Purchasers' characterization of some of the class members as "small" noting that the class members' estimated annual revenue ranges from $41.8 million to $482.1 billion. Ranbaxy rejects Direct Purchasers' contention that it would be uneconomical for smaller claimants to pursue litigation via joinder, noting that the "vast majority" of class members have trebled claims in excess of $1 million with the largest three wholesalers having claims in the range of $200 million to $1 billion. Ranbaxy also notes that one of the class members with a relatively small claim – King Drug – is already a named Plaintiff and three other members with smaller claims have been plaintiffs in other patent or Hatch-Waxman antitrust cases.

Ranbaxy contends that the claims here are commonly and typically pursued on a contingency fee basis minimizing any financial disincentive to pursue this litigation via joinder. Direct Purchasers do not dispute this representation. Lastly, Ranbaxy points out that the prior litigation demonstrates that the wholesalers can and have cooperated with each other to reduce the costs of joined litigation.

In considering these respective arguments, I first observe that the Third Circuit has spoken very clearly and directly about the ability and motivation of the proposed class members, stating that the class members "appear likely to have the ability and incentive to bring suit as joined parties." In re Modafinil Antitrust Litig., 837 F.3d at 258. The Third Circuit further amplified this point, stressing that:

> In fact, three class members, none of whom are named plaintiffs, each have claims estimated at over $1 billion—even before the trebling of damages. These three make up over 97% of the total value of the class claims, and can hardly be considered as candidates who need the aggregative advantages of the class device. While this factor could weigh in favor of class status *if* the remaining class members had very small claims, that is simply not the case here.

In re Modafinil Antitrust Litig., 837 F.3d at 258.

Keeping these directives in mind, for several reasons, I conclude that the record on this factor has largely remained unchanged and continues to demonstrate that the absent class members have both the ability and motivation to litigate via joinder.

First, the evidence of record simply does not support Direct Purchasers' argument that litigation costs exceed many of the class members' potential damages, thus rendering joinder an uneconomical option. According to the low end estimates offered by Direct Purchasers' expert, eight class members have trebled damages claims below $1 million, many class members have trebled damages claims in excess of $5 million and three have trebled damages claims in excess of $200 million. (Pls.' Mot., Ex. 4, Leitzinger Decl., Ex. 4.)

Direct Purchasers argue that class members with trebled damages below $5 million have negative value claims because the cost of joining in the lawsuit would exceed their potential recovery. But this conclusion is untenable for several reasons. Direct Purchasers assume, if litigation were to proceed via joinder, that each putative class member would spend the entire $5.3 million that the Direct Purchasers estimate they will spend through trial. There is simply no basis in the record to make such an assumption.

Furthermore, Direct Purchasers have not challenged Ranbaxy's assertion that any legal representation in a potential joinder action here would be on a contingent basis. The reality of contingent representation significantly undercuts Direct Purchasers' argument regarding litigation costs to the extent that a significant portion of the $5.3 million figure represents attorney's fees. In other words, the fact that all class members, even those with such so-called "small" claims, would likely be represented on a contingent basis undermines Direct Purchasers'

position that taking on litigate via joinder would necessarily be a losing proposition for such "small" claimants.

Second, I agree with Ranbaxy, that it is reasonable to expect that the class members will share some, if not the majority of, litigation costs as the different groups of plaintiffs have done throughout the life of this litigation.

Third, contrary to Direct Purchasers' contentions, the affidavits from the putative class members do not demonstrate that they lack the ability or motivation to litigate via joinder or that joint litigation agreements are not feasible. Rather, the affidavits simply establish that the putative class members have not evaluated the prospect of proceeding by joinder.

And lastly, Direct Purchasers have again failed to offer any concrete evidence to support their concern about the hypothetical risk of retaliation and, as such, I do not find their unsupported concerns to be probative.

In light of the foregoing, I conclude that the ability and motivation of the Direct Purchasers to litigate via joinder weighs in favor of denying class certification.

### iii.  Financial Resources of Class Members

Direct Purchasers concede that some class members have the financial resources to take on the massive litigation costs in this case but again urge that it would be a "losing proposition" for members with smaller claims. Ranbaxy responds that the financial resources of the class members and the large size of their claims are "inconsistent with class action treatment." (Def.'s Resp. p. 20.)

I previously concluded that the financial resources of the class members weigh against certification. King Drug, 309 F.R.D. at 207. This conclusion remains unchanged. Based on the supplemental record, it appears that all but six class members report annual revenue in excess of

$100 million and nine class members report annual revenue in the range of $2 billion to $482.1 billion. (Def.'s Mot., Ex. 1.) Given the class members' significant financial resources, this factor weighs against certification.

### iv. Geographic Dispersion of Class Members

In previously concluding that the geographic dispersion of the class members weighed in favor of class certification, I noted that the class members were spread out over thirteen states and Puerto Rico and that this would "present challenges to Plaintiffs in attempting to coordinate the litigation if all class members were joined, particularly if additional discovery was required." King Drug, 309 F.R.D. at 207.

The supplemental record indicates that, even with the addition of Wal-Mart, Publix and Bi-Lo, the potential class members continue to be spread out over thirteen states and Puerto Rico. Although the parties are geographically dispersed, the sophistication of the class members, the fact that many of the class members have previously litigated in Pennsylvania and the participation of geographically disperse named plaintiffs and counsel in the case to date, all undercut the weight that should be placed on this factor. In sum, I conclude this factor weighs slightly in favor of class certification.

### v. Ability to Identify Future Claimants

Direct Purchasers offer no argument with respect to this factor. Ranbaxy briefly notes that all class members have been identified and, therefore, there is no issue posed by the ability to identify "future claimants." While the Third Circuit stated that "ability to identify future claimants" was a relevant factor to consider, the court did not elaborate any further on the parameters of that analysis.

Regardless of what the Third Circuit intended to capture with this factor, what is clear from the court's decision is that the first two factors – judicial economy and ability and motivation to litigation via joinder – are of primary importance. Even if the ability to identify future claimants weighs in favor or against class certification, it would have no impact on my ultimate conclusion.

#### vi. Whether the Claims are for Injunctive Relief or for Damages

Lastly, the Third Circuit instructed that I consider whether the Direct Purchasers' claims are for injunctive relief or for damages. This factor weighs in favor of class certification where the claims are for injunctive relief rather than damages. See Weiss v. York Hosp., 745 F.2d 786, 808 (3d Cir. 1984) ("individual interest in pursuing litigation where the relief sought is primarily injunctive will be minimal"). As Direct Purchasers are not seeking injunctive relief, this favor weighs against certification of the Direct Purchaser class.

### IV. <u>CONCLUSION</u>

As the two factors of "primary importance" weigh strongly against class certification, I conclude that Direct Purchasers have not proven by a preponderance of the evidence that the class members are so numerous as to render joinder impracticable. As such, Direct Purchasers' supplemental motion for class certification will be denied.

An appropriate order follows.